SAMMY DAVIS, JR. AND ALTOVISE DAVIS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Davis v. Commissioner
Docket Nos. 36610-86, 47504-86, 21136-87, 35615-87
United States Tax Court
T.C. Memo 1989-607; 1989 Tax Ct. Memo LEXIS 605; 58 T.C.M. (CCH) 650; T.C.M. (RIA) 89607; November 7, 1989
Donald T. Cheatham, for the petitioners. Kristine A. Roth, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined deficiencies and additions to tax in Sammy Davis, Jr.'s, and Altovise Davis' Federal income tax as follows: Additions to Tax
Section [2]
Section
Section
Year
Deficiency
6659
6651(a)(1)
6653(a)
1978
$ 126,414.00
--     --    $ 6,321.00
1979
266,712.00
--     --    13,336.00
1980
381,225.00
--     --    19,061.00
1981
464,316.00
--     --    [3] 23,216.00
1982
426,073.15
127,821.95
42,607.32
[3] 23,190.25
*607 The Commissioner also claimed additional interest under section 6621(c) for petitioners Sammy Davis, Jr., and Altovise Davis for all the taxable years in issue. In his answer, respondent determined an increase in the deficiency for the Davis' taxable year 1978 from $ 1,306 to $ 126,414. The Commissioner determined deficiencies in Kenneth M. and Virginia Endicott's Federal income tax for taxable years 1980, 1981, and 1982 in the amounts of $ 45,911, $ 48,890, and $ 49,178, respectively, as well as additional interest pursuant to section 6621(c). By his answer, the Commissioner determined an addition to tax for petitioners Kenneth M. and Virginia Endicott pursuant to section 6661 for taxable year 1982. The Commissioner also determined a deficiency in Eric W. and Susan A. Ball's Federal income tax for taxable year 1982 in the amount of $ 97,714.77, and additional interest pursuant to section 6621(c). After numerous concessions, [4] the issues we must decide are: (1) whether the transaction before us was devoid of economic substance, and, if not, whether petitioners are entitled to deduct amounts paid as minimum annual royalty payments in taxable years 1980, 1981, and 1982, (2) *608 whether petitioners are entitled to deduct certain payments as interest in 1980, 1981, and 1982, and (3) whether petitioners are liable for additions to tax and increased interest in taxable years 1980, 1981, and 1982. FINDINGS OF FACT Some of the facts are stipulated and are so found. Petitioners Sammy Davis, Jr., and Altovise Davis ("the Davises"), husband and wife, resided in Beverly Hills, California at the time they filed the petition; the Davises jointly filed Federal income tax returns for taxable years 1980, 1981, and 1982. Petitioners Kenneth and Virginia Endicott ("the Endicotts") were husband and wife who resided in Potomac, Maryland at the time they filed their petition. The Endicotts jointly filed Federal income tax returns for taxable years 1980, 1981, and 1982. Subsequent to the filing of the petition herein, Kenneth M. Endicott *609 died and his estate was substituted as a party petitioner with Virginia Endicott as the personal representative. Petitioners Eric and Susan Ball ("the Balls"), husband and wife, resided in Marathon, Florida at the time they filed their petition. The Balls filed joint Federal income tax returns for taxable year 1982. The parties have stipulated that venue on appeal will lie in the United States Court of Appeals for the Fourth Circuit, regardless of where any petitioner resided at the time of filing the petition. All of the deficiencies at issue relate to the petitioners' investments in a limited partnership known as Cannel City Associates ("Cannel City"), formed on December 31, 1980, under the laws of Ohio. Cannel City's sole general partner was Cannel City Management Corporation ("the general partner") organized by Ernest William Hall, Jr. ("Hall"). Hall had been involved in one other coal mining venture in 1976 and previously had been employed as an accountant and investment counselor. In order to solicit subscriptions to Cannel City, Hall circulated a Private Placement Memorandum ("the Memorandum"). The Memorandum was prepared by Dennis Wilcox ("Wilcox"), an attorney associated *610 with the law firm of Climaco, Seminatore, Lefkowitz & Kaplan Co., L.P.A. ("Climaco, Seminatore") of Cleveland, Ohio. John Climaco ("Climaco") of Climaco, Seminatore had been the Davises' attorney for several years prior to the taxable years in issue and recommended the Cannel City investment to them. Through his involvement with Cannel City, Hall was introduced to the Davises, and after 1983 Hall became one of Sammy Davis, Jr.'s, most trusted financial counselors. Because Hall was personally acquainted with the Endicotts, he invited them to invest in Cannel City. The Memorandum, dated December 15, 1980, explained that Cannel City planned to lease the mining rights to approximately 3,000 acres of land in Kentucky for the purpose of mining and selling both canneloid and bituminous coal. Bituminous coal is soft coal that, depending on BTU content and other chemical characteristics, can be burned to produce heat either for a utility's generating of electricity or for metallurgical purposes. Canneloid coal cannot be suitably ground for utility company use. Canneloid coal is harder, cleaner, and burns at a higher temperature than bituminous coal but has a lower ignition temperature. *611 Canneloid coal had no established major market at the time Cannel City was formed. Bagged canneloid coal was available in some retail stores for customers who burned coal to heat their homes. The Memorandum stated that the partnership planned to sell five-pound or ten-pound bags of canneloid coal at the price of 50 cents per pound to consumers. Canneloid coal is an excellent home heating source because it burns cleanly, producing great heat, and is easy to light with a match. The Memorandum stated that the desired sales price for the canneloid coal of $ 200 per ton was nearly 10 times the ordinary selling price for canneloid coal as follows: [5]
The success of this Project and the feasibility of meeting the production schedules and economic projections set forth herein as Exhibit B are primarily based upon the ability to economically mine, package, distribute, market and sell Cannel Coal on a retail level to the general public at a final selling price equalling $ 200 per ton. This price is nearly 10 times the selling price for such coal if it were sold on the traditional coal market. If such ultimate selling price could not be achieved, the economic projections contained herein *612 concerning cash flow could not be obtained even if more of the Other Coal on the Coal Property were sold. The Memorandum also stated that "no such coal has ever been marketed on a nationwide retail basis." Cannel City planned to sell any bituminous coal that was mined to utility companies at a price of $ 30 per ton. The Memorandum indicated that the leased property contained approximately nine million tons of probable in-place coal reserves including five million tons of canneloid coal and four million tons of bituminous coal. This was based on a report prepared by John Sparr ("Sparr"), vice president of Hill Engineering Company of Prestonburg, Kentucky ("Hill Engineering"), that was included in the Memorandum without Sparr's knowledge. Neither the Sparr report nor the Memorandum indicated the quality of the coal reserves (sulphur content, moisture, ash, grind, BTU). Sparr did not prepare *613 his report for distribution to investors. The property that Cannel City planned to mine included two separate areas known as the Howell leases ("the Howell leases") and the Morgan Reserve leases ("the Morgan Reserve leases"). Sparr's report evaluated the coal producing potential of the Howell leases but not the Morgan Reserve leases. Sparr noted that the area had been extensively commercially mined between the early 1900's and the 1950's. In addition to large-scale deep mining, Sparr observed some noncommercial shallower mines. Because he did not have accurate geological maps of the deeply mined areas, Sparr confined his report to an estimate of "probable in-place" amounts. After drilling six holes, known as core holes, on the Howell leases to measure the depth of the coal seams underneath, Sparr ascertained that there were several seams of coal ranging in width from 10 inches to 45 inches with a parting. [6] Only one of the core holes indicated a seam of coal that was at least 30 inches wide and Sparr later concluded that this hole was located in a pillar of coal and did not reflect the typical width of the seam. Based primarily on visual examination of the surface, Sparr concluded *614 that there were 9,158,921 tons of coal on and under the property. The Memorandum warned prospective investors that the reserves of coal might not be economically recoverable. In addition, Sparr estimated that the property contained about 1.5 million tons of gob. Gob is a waste product of deep mining and comprises large piles of rock, shale, dirt, small pieces of coal, and other substances. Piled in huge mounds near the mines, gob piles are occasionally on fire, smoldering quietly inside for months and even years. Gob piles also pose an environmental threat because they may leak acidic substances into surrounding soil. Sparr evaluated the contents of the gob piles without drilling core holes. Although Sparr was aware of the gob piles when he wrote his report, neither his report nor the Memorandum mentioned the potential for recovering coal from the gob piles. Hall referred to the gob piles as a source of recoverable coal in discussions with potential investors. In the fall of 1980, Hall and Sparr had visited the property where the canneloid coal was located and Hall decided that it would *615 be easy and inexpensive to mine. Although he noticed the shallow noncommercial mines and the evidence of older deep mining, he also observed pieces of canneloid coal lying on the ground and several large gob piles. Because he thought that the coal was readily accessible, Hall decided that recovering it would not be costly. Hall concluded that it would be easy to strip mine the property because much of the canneloid coal was on or near the surface. In reaching this conclusion, Hall relied on his own judgment and experience as well as on Sparr's report. The Memorandum limited investment subscription offers to persons with high taxable incomes whose net worth exceeded $ 250,000 because of the high degree of risk involved. Cannel City was formed after 21 subscription units out of a total of 60 had been obtained. The general partner received a five-percent interest in partnership capital and the limited partners received interests in the remaining 95 percent of the capital, purchasing subscription units in the following amounts: Investor
Number of Units
Percentage of Total
Davis
18
81.4%
Endicott
2
9%  Fernandez
1
4.6%
Soon after the formation *616 of the partnership, Fernandez withdrew, increasing the shares of the Davises and the Endicotts to 85.5 percent and 9.5 percent, respectively. On October 15, 1982, a second Private Placement Memorandum ("the second Memorandum") was circulated to solicit investments for 10.5 more units leaving the investors with the following investment shares: Investor
Number of Units
Percentage
Davis
18 54%
Endicott
2 6%
Nye
1 3%
Bockholt
1.5
5%
Cunningham
2 6%
Murphy
2 6%
Ball
5 15%
Each subscription unit cost $ 150,000 with $ 2,500 payable in cash and $ 147,500 payable in a full recourse demand promissory note ("the promissory note") bearing interest at eight percent resulting in a monthly cost of $ 1,410 per partnership unit. Sometime after the formation of Cannel City, Hall decided not to sell the canneloid coal in bags. Instead, Hall planned to market the canneloid coal in the shape of a log of wood ("the coal log") to consumers. The coal log would be sold in supermarkets and hardware stores for use in fireplaces and stoves, capitalizing on the increasing demand for alternative sources of energy. The coal log project was first stated *617 in the second Memorandum issued on October 15, 1982. [7]
In 1980, a log of processed canneloid coal had never been manufactured. A similar log composed of bituminous coal had been developed in 1980 and was commercially manufactured by Coal Technology Corporation ("Coal Technology") in 1982. Coal Technology's coal log was made of coal dust, sawdust, paraffin and a binding agent. It was designed chiefly for aesthetic appeal and generated relatively little heat. Furthermore, because it depended on paraffin for combustion, the manufacture of the coal log was subject to fluctuations in the market price of oil and petroleum products. Coal Technology ceased producing coal logs in 1983 and began selling the bituminous coal directly to utilities. Hall wanted to adapt Coal Technology's technical process and produce coal logs from the canneloid coal that Cannel City was planning to mine. Therefore, in 1982, Hall sought out David Houge ("Houge"), who was president of Coal Technology. Houge left Coal Technology in 1983. On August 17, 1982, Cannel *618 City and Coal Technology formed a joint venture to develop, manufacture, and market a coal log made from canneloid coal. The canneloid coal log was projected to be harder and cleaner and to generate more heat than the bituminous coal log. Furthermore, it could be lit with a match. The keys to the financial feasibility of the project were (1) the invention of a binding agent that was not based on a petroleum product and (2) the availability of substantial canneloid coal reserves. Coal Technology agreed to join Cannel City in the project based largely on Hill Engineering's report that Cannel City had mining rights to four or five million tons of canneloid coal. In an effort to develop a non-oil based binding agent for a canneloid coal log, Hall contacted Cyril Pomonomura, a professor at the University of Maryland, who recommended two commercial laboratories to conduct the research. Hall discussed the problem with personnel from the suggested laboratories and also with an employee of Eastman Kodak. All these scientists informed Hall that the research would be very expensive and success could not be guaranteed. Cannel City leased the mining rights to the Howell leases and the Morgan *619 Reserve leases for 15 years from Salem Coal Corporation ("Salem"), which was the successor in interest to Capital Coal Corporation ("Capital"). Salem had been organized under the laws of the Commonwealth of Virginia and was licensed to do business in Kentucky. The lease agreement established that Salem would receive minimum annual royalty payments of $ 50,000 per partnership unit sold up to $ 3,000,000. In 1980 and 1981, 21 subscriptions units had been sold, and the minimum royalty due was $ 1,050,000; in 1982 and afterwards, when the number of subscription units increased to 31.5, Cannel City owed Salem an annual minimum royalty of $ 1,575,000. Salem would also receive 25 percent of the gross sales price per ton of steam coal and 10 percent of the gross sales price per ton of canneloid coal. By contrast, in 1977 Salem, then doing business as Capital, had leased the mining rights to the Howell leases from the Howell family for an annual cash payment of $ 30,000 plus a percentage of coal production revenues. [8]
Salem had not made any royalty payments or mined any coal for the 2 years *620 before Cannel City was formed. On December 22, 1980, as a result of the sublease between Salem and Cannel City, the lease between the Howell family and Salem was modified and reinstated. Salem was obligated to pay the Howell family advance minimum royalties in the amounts of $ 5,000 per month for 1981 and 1982, $ 7,500 per month for 1983, and $ 10,000 per month for 1984 and thereafter. Salem leased only the strip-mining and the deep-mining rights and did not acquire the right to recover coal from the gob piles on the property. The Howell family's rights upon default were limited contractually to the termination of the lease. Salem was obligated to perform a marketing and feasibility study by June 1, 1982, that would include a mining plan and a chemical analysis of coal from the leased property. Salem was also responsible for procuring a manufacturing plant in which the coal logs could be produced. The Memorandum further indicated that Salem would pay the expenses associated with the organization and operation of the entire venture. Salem also leased Cannel City a tipple facility, a device for loading coal into railroad cars, which was located over 100 miles away in Whitesburg, *621 Kentucky. Whitesburg was the site of a station on the L & N Railway which was suitable for shipping coal to the Southeastern United States. There were other railroad stations closer to the Cannel City property that would have been appropriate for shipping coal to the north and the east. The cost of shipping a truckload of coal from the Cannel City property to the tipple facility in Whitesburg was approximately $ 20 per ton. Salem's sole remedy in the event of the partnership's default in any of its obligations under the sublease, including failure to pay minimum or production royalties, was to terminate the contract. The terms of the sublease specifically released the general partner and the limited partners from liability for any delinquent royalties if Cannel City breached any provision of the sublease. Paragraph 6 of the sublease provided in part as follows: If Cannel defaults under any of its obligations hereunder as provided above, then Cannel shall forfeit its rights hereunder as liquidated damage, but Cannel shall not be obligated to pay any minimum or production royalty then or to be due and owing Salem after such date of forfeiture. On December 31, 1980, Cannel *622 City assigned to Salem the unsecured promissory notes that the limited partners had issued as full payment of the advance minimum royalty for 1980. The terms of the promissory notes prevented Salem from assigning them to a third party. The actual mining of coal was to be performed by Allied Coal Corporation ("Allied"), a corporation organized under the laws of the Commonwealth of Virginia and licensed to do business in Kentucky. The shareholders and officers of Allied were the shareholders and officers of Salem. Allied agreed to extract all mineable and merchantable coal by strip-mining or deep-mining methods. Allied was to be paid for its services only out of the proceeds generated by the sale of the mined coal and would receive 71.43 percent of the selling price for each ton of coal mined and sold. Production of coal was anticipated to start in 1983. The mining schedule included in the Memorandum indicated that Allied was to produce, at a minimum, 25,000 tons of canneloid coal and 33,333 tons of bituminous coal in 1983 and 50,000 tons of canneloid coal and 66,667 tons of bituminous coal per year starting in 1984. In addition to conducting the actual mining operation, Allied *623 was to obtain all the necessary mining permits. Furthermore, Allied was responsible for processing the mined coal and manufacturing it into logs. In order to facilitate payment of the annual minimum royalty payments from the limited partners to Salem, Hall created an escrow account. The escrow agent was Wilcox of Climaco, Seminatore. Wilcox was authorized to collect payments that the limited partners made with respect to their promissory notes and to pay to Salem $ 29,610 per month for no longer than 15 years which was to be credited toward the minimum royalty payments due of $ 1,050,000 in 1980 and 1981, and $ 1,575,000 in 1982 and thereafter. In 1981, Wilcox collected payments of $ 307,380 from the limited partners and paid out $ 233,516 to Salem. Although the Memorandum indicated that Salem would be responsible for paying the organization and operating expenses, such expenses were, in fact, paid directly from the escrow account. Thus, in 1981, Wilcox paid $ 25,000 to Climaco, Seminatore as legal fees and $ 28,200 to the general partner as management fees. In 1982, Climaco, Seminatore withdrew as legal counsel to Cannel City and, thus, Wilcox withdrew as escrow agent. He *624 was replaced by Roger Klein ("Klein") of the law firm Plaia & Shaumberg in January of 1982. Concurrent with that substitution, a new escrow agreement was executed that made Cannel City's monthly payments to Salem contingent on the availability of partnership funds but in any event limited to the greater of $ 29,610 or the amount Salem owed on its leases to the owners of the property. In 1982, Klein paid $ 5,000 to Climaco, Seminatore for legal services, $ 5,640 to the general partner for management services, and $ 39,232 to Salem. By the end of 1982, Hall realized that neither Salem nor Allied was performing any of its contractual duties. Salem had failed to begin a feasibility or marketing survey. Salem estimated the cost of producing the coal log at $ 30 per ton but provided little detail of the proposed operation. The gist of Salem's plan was that the mining would be accomplished by contract miners operating in several small and discrete areas in an attempt to avoid regulation by State and Federal mining agencies. Allied had not begun to obtain the necessary mining permits. Without a binding agent and Coal Technology's assistance, Hall considered abandoning the coal log *625 concept. In April 1982, the limited partners stopped making payments to the escrow account with respect to the promissory notes upon Hall's suggestion. Salem protested, but by 1983 Cannel City had completely defaulted on the notes. Salem then sued Hall individually and as the sole shareholder of the general partner of Cannel City for payment of the promissory notes and was awarded a default judgment against him. Subsequently, Salem and Hall agreed to forget about the entire matter. Salem relinquished the promissory notes which had been assigned from Cannel City. In 1986, Hall invested the promissory notes in a project to develop a shopping center in Virginia. At the time of trial, all petitioners were faithfully making payments on the promissory notes. On its Federal income tax returns, Cannel City reported losses in the following amounts: Item
1980
1981
1982
Advanced Royalty
$ 1,000,333
$ 1,000,333
$ 1,575,333
Salaries
45,000
64,200
-0-
Management Fee
-0-
-0-
31,021
Expenses
-0-
-0-
17,084
Attorney's Fee
-0-
-0-
5,898
Bank Fee
-0-
-0-
91
TOTAL
$ 1,045,333
$ 1,064,533
$ 1,629,427
The Endicotts claimed deductions *626 for their distributive shares of Cannel City's losses for taxable years 1980, 1981, and 1982 in the amounts of $ 95,032, $ 101,131, and $ 97,766, respectively. The Endicotts further claimed deductions for interest paid with respect to their promissory notes that had been assigned to Salem in taxable years 1981 and 1982 in the amounts of $ 10,000 and $ 15,554, respectively. The Davises claimed deductions for their distributive shares of Cannel City's losses for taxable years 1980, 1981, and 1982 in the amounts of $ 893,759, $ 910,176, and $ 888,035, respectively. The Balls claimed deductions for their distributive share of Cannel City's losses for taxable year 1982 in the amount of $ 244,414. OPINION The first issue we must decide is whether the transaction before us lacks economic substance. If we determine that this transaction was devoid of economic substance, then the deductions that petitioners claimed for partnership expenses and minimum annual royalty payments will be denied. A transaction is without its intended effect for purposes of Federal income tax if it is devoid of economic *627 substance consonant with its intended tax effects. Knetsch v. United States, 364 U.S. 361, 366 (1960); James v. Commissioner, 87 T.C. 905, 918 (1986); Law v. Commissioner, 86 T.C. 1065, 1093 (1986). A transaction does not have economic substance if it does not provide a realistic potential for profit, apart from Federal income tax benefits. Cherin v. Commissioner, 89 T.C. 986 (1987). A transaction will not be disregarded for purposes of Federal income tax simply because it is motivated by considerations of reducing tax. Gregory v. Helvering, 293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). Nonetheless, to avoid being disregarded, a transaction must be compelled by business realities rather than by tax avoidance features with meaningless labels. Frank Lyon Co. v. Commissioner, 435 U.S. 561, 583-84 (1978). In determining whether the transactions at issue were *628 devoid of economic substance, we consider the expert witnesses' testimony and reports though we are not bound by the opinion of any expert witness even when it is uncontroverted. Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). Petitioner introduced the report and testimony of George E. Dials ("Dials"). Dials, an expert on the financial feasibility of mining operations, testified about Hall's plan to mine and market canneloid coal. In his report, Hall stressed the severity of the U.S. energy crisis in the late 1970's and early 1980's. Because American dependence on foreign oil was considered by many to be unwise and unsafe, the country experienced a strong move toward the development of alternative energy sources. The project to mine, manufacture, and sell logs made of canneloid coal could only be understood in the context of the energy crisis, according to Dials. Relying on data from the National Wood Heating Alliance, in Washington, D.C., Dials mentioned that, in the early 1980's, there had been a surge in the popularity of fuel suitable for *629 wood stoves and fireplaces. Dials predicted that if the canneloid coal could be successfully formed into an aesthetically appealing log, it could be sold for at least $ 500 per ton, because it would provide more heat than other commercially available wood log substitutes. Although Dials did not perform his own study of the economic recoverability of the coal reserves in the Howell leases and the Morgan Reserve leases, he stated that the Hill Engineering report was adequate to support investment. Respondent introduced a report prepared by Joyce Associates, Inc. ("the Joyce report"), a mining engineering company organized in Virginia. The Joyce report was written by Michael C. Jaron ("Jaron") and Vince Joyce ("Joyce"), the president and vice president of Joyce Associates, Inc., respectively. In order to amass enough information to allow an informed investment decision, the Joyce report indicated that three steps were necessary: (1) a coal exploration program, (2) an evaluation and feasibility study, and (3) a detailed mine design and reclamation plan. The Joyce report noted that Cannel City was formed on the basis of a limited coal exploration report alone although Salem was supposed *630 to prepare a feasibility study prior to the actual commencement of mining operations. In the first step, the coal exploration program, information is collected from geological surveys and maps as well as from on-site drilling. The coal exploration stage produces "an accurate three-dimensional map of the prospective mine, reflecting coal elevation, thickness, continuity and variation in coal height, coal quality and quantity and the nature and quantity of the overlying rock, as well as the determination of potential environmental problems." The second stage of study, the evaluation and feasibility study, involves "an estimate of the tons of recoverable coal, the annual production rate, an analysis of market needs and location, transportation availability and cost, and product quality versus consumer specifications and demand." The third stage is the preparation of a detailed mine design and reclamation plan which involves a choice of mining techniques. Surface mining or strip mining is only appropriate when the ratio of cubic yards of overburden per ton of coal extracted is not more than 15:1. Further, at a 15:1 overburden ratio, it is uneconomical to strip-mine a seam of coal *631 that is no more than 24 inches thick or to deep mine a seam of coal that is less than 30 inches thick. Once mining is completed, the land must be restored to its original condition. Jaron and Joyce noted that the property that Cannel City planned to mine was below the drainage level and that, therefore, the old mines on the property would be susceptible to flooding from water and gas. In preparing their report, Jaron and Joyce consulted various United States government publications and geological surveys as well as making a visual examination of the Howell leases. They determined that there were 922,961 tons of economically recoverable canneloid coal contained within the Howell lease and none within the Morgan Reserve leases. Furthermore, the Joyce report stated that the Howell leases and the Morgan reserve leases together contained 807,590 tons of economically recoverable bituminous coal. The Joyce report described the coal seam which ran through the Howell lease property as 36 inches thick, 16 inches of canneloid coal and 14 inches of bituminous coal, split by 6 inches of rock. In calculating this amount, Jaron and Joyce used only "measured" and "indicated" coal reserves. "Measured" *632 coal reserves are located and calculated by drilling core holes spaced no more than one quarter of a mile apart and "indicated" coal is calculated by drilling core holes no more than three quarters of a mile apart. "Inferred" reserves can be calculated by assuming that the beds or seams of "measured" and "indicated" coal continue. "Inferred" data is not considered a reliable basis for investment decisions. Sparr's report relied on "inferred" data from a few core holes. Joyce and Jaron also noted that the Howell leases had been extensively mined during the first half of the twentieth century. Such large-scale mining activity threatened subsequent mining operations because the old mining shafts could be filled with water or gas making later mining difficult and dangerous. Similarly, in calculating the possible reserves of coal on the Howell lease, Joyce and Jaron did not consider the value of coal in the gob piles because information on its potential for coal recovery was incomplete. Without a core sampling of each gob pile, a cursory visual inspection cannot show whether the pile is on fire or burnt out, whether the pile has any recoverable coal, or what the likely environmental *633 effects of disturbing the pile would be. The Joyce report further noted that the market prices for bituminous coal of the quality of the Howell and Morgan leases compiled by the United States Department of Energy ranged between $ 18.98 and $ 23.77 per ton from 1977 through 1982. In the Memorandum, the proposed sales price for bituminous coal was placed at $ 30 per ton. Jaron and Joyce further determined that if the coal log could not be feasibly manufactured and marketed, then the canneloid coal could be sold to utility companies at the price of bituminous coal by mixing it in limited quantities. It was unlikely that utility companies would be interested in purchasing canneloid coal. Finally, the Joyce report posited the estimated production costs for both types of coal at $ 20 per ton to transport the coal to market and $ 10 per ton for screening, bagging, and overhead. Dials' report was directed almost exclusively at the marketability of a canneloid coal log during the energy crisis. While his opinion is useful, it does not address the question of whether canneloid coal could have been economically recovered, processed, and sold under Cannel City's plan. Because the Joyce *634 report thoroughly and convincingly analyzes the economic validity of all the components of Cannel City's plan, we rely extensively on that report and adopt its findings. Several factors indicate that the Cannel City investment plan is devoid of economic substance. The most noteworthy is the insufficient quantity of economically recoverable coal on the property that Cannel City leased from Salem. Although the Memorandum refers to nine million tons of coal, we believe that the true figure for economically recoverable reserve is closer to 10 percent of that amount as stated in the Joyce report. Furthermore, as Joyce and Jaron explained, the tunnels and shafts that remained from earlier mining operations could cause potentially expensive and dangerous problems for subsequent mining operations. Similarly, Hall's rosy projection of the amount of coal Cannel City would recover is based partially on the expectation of recovering a significant amount of coal from gob piles, but such a prospect was unlikely. First, Salem's lease is at best ambiguous on whether it gives Salem the right to process gob on the Howell reserves; probably it does not because Salem's right to mine coal is limited *635 to either strip or deep-mining methods, neither of which would be used to recover coal from gob. Because Salem had not leased the rights to extract coal from the gob piles from the Howell family, it could not have sublet these rights to Cannel City. Second, Hall did not know either the actual size or the qualitative composition of the gob piles on the property. He did not attempt to analyze the condition of the interior of the piles which had existed for as long as 50 years. The gob piles as a source of recoverable coal on these properties were purely fanciful, and Hall's fascination with the gob piles manifests his lack of knowledge of mining coal for profit. Not only was the entire transaction based on a false premise about the quantity of recoverable coal, but the contractual arrangements between the various entities were illusory. Although the limited partners seemed to assign binding, full-recourse promissory notes to Salem in satisfaction of the minimum royalty obligations, the notes were unenforceable and unmarketable. The illusory million-dollar-a-year-plus minimum royalty that Cannel City agreed to pay Salem was nearly 10 times the minimum royalty that Salem paid to *636 lease the reserves. Moreover, the lease between Cannel City and Salem protected the limited partners from all liability restricting Salem's right of redress to the limited partnership interests. The terms of the notes prohibited Salem from assigning them to anyone else. Similarly, according to the terms of the lease with Salem, the Howell family had no redress against Salem for breach of contract except termination of the lease. Perhaps most noteworthy, when Salem finally did sue Hall for breach of contract, Salem failed to collect on a default judgment and both parties agreed to "walk away from the litigation" for reasons which were never explained. If the arrangement between Salem and Cannel City had reflected reality, Salem's abandoned claim for a million dollars of annual royalties would have a sound and ready explanation. We believe the explanation is that the sublease specifically released Cannel City for any unpaid minimum royalties after termination of the sublease by default. Additionally, Cannel City's marketing plan was absurdly optimistic. Although Hall admitted that canneloid coal was not attractive to utility companies and that the market for bagged canneloid *637 sold to consumers was insignificant, the Memorandum baldly stated that the bagged canneloid coal would be sold at 10 times its usual price. Furthermore, there was no evidence to suggest that when Cannel City was formed, canneloid coal could become a particularly popular alternative energy source for private heating. It would have required a significant promotional effort for Cannel City to create a market for bagged canneloid coal which it was not prepared to undertake. Although conceptually the coal log made of canneloid coal is not implausible, Cannel City's coal log was never close to realization. The terms of the joint venture agreement between Coal Technology and Cannel City did not obligate either party to produce anything certain. Perhaps the most fundamental requirement for the coal log project was the discovery and development of a binding agent that would keep the coal in the log shape as it burned. Hall did not even begin looking for such a binding agent until 1982, just a year before the venture was abandoned. Furthermore, Cannel City never required Salem to complete a formal marketing plan. The financing of the venture put the Cannel City investors at a disadvantage. *638 Cannel City was obligated to pay Salem and Allied a combined 96.43 percent of the proceeds from sales of bituminous coal and 81.43 percent of the proceeds from sales of canneloid coal. This left Cannel City with only 3.57 percent and 18.57 percent of the proceeds from the sale of bituminous and canneloid coal, respectively. From this amount, Cannel City had to pay Salem a minimum royalty of $ 1,050,000 in 1980 and 1981 and $ 1,575,000 in 1982 and thereafter. Using figures for production and transportation costs of $ 10 and $ 20 per ton respectively, as stated in the Joyce report, Cannel City would have to sell 220,588 tons of canneloid coal at $ 200 per ton each year in order to cover its costs and pay the minimum royalty. If Cannel City mined 50,000 tons of canneloid coal each year, as projected in the Memorandum, the net return would be only $ 357,000, less than half of the minimum royalty. At $ 25 per ton for canneloid coal, which the Joyce report considered optimistic, Cannel City would not have been able to cover the production and transportation costs of $ 30 per ton. With a return of only 3.57 percent, the Joyce report concluded that it would not be economical for Cannel *639 City to mine bituminous coal at all because the production and transportation costs would exceed the sales price. The planned use of a tippling facility 100 miles from the coal reserves on a railroad that would ship the coal south is one more reflection of the thoughtless marketing effort of Cannel City. The venture was eyewash for sheltering the investors' other income with tax deductions. It was never a genuine mining operation. There was no realistic expectation that the coal could be economically recovered in the amounts indicated in the Memorandum. The parties to the transaction never intended for Salem and Allied to receive annual minimum and production royalties in the amounts indicated in the various contracts and leases. From the beginning the payments into the escrow account were sufficient only to pay Salem's royalties on the underlying leases plus transactional costs. The leases and contracts that purported to require payment and performance from the many entities involved were chimerical. In light of the impossibility of Cannel City's financial success, we conclude that the transaction had no economic substance. As discussed further below, the purported promissory *640 notes that were assigned to Salem as payment of the minimum royalty were illusory and have no significance for purposes of Federal income tax. We hold that the deductions claimed for petitioners' distributive shares of partnership losses and for payment of the minimum royalties were improper and cannot be sustained. Petitioners argue on brief that their investments in Cannel City were prompted by a profit objective. In support of the actual testimony to that effect by Virginia Endicott, Eric A. Ball, and Sammy Davis, Jr., petitioners urge us to recollect that in the early 1980's the country's response to the energy crisis spurred research and investment in many alternative energy projects that were as risky as Cannel City's canneloid coal log project. Unfortunately, petitioners' well-meaning generosity cannot serve to infuse any profit potential into the doomed structure of Cannel City's plan. Economic substance is not provided by petitioners' good intentions. Cherin v. Commissioner, 89 T.C. at 994. The second issue we must decide is whether petitioners were entitled *641 to deductions for interest in taxable years 1980, 1981, and 1982 paid with respect to the promissory notes. Although the form of the promissory notes indicates that they are full recourse notes payable on demand, our analysis is not restricted to a superficial examination. Waddell v. Commissioner, 86 T.C. 848, 900 (1986), affd. 841 F.2d 264 (9th Cir. 1988). Where a note does not evidence true indebtedness, it cannot generate deductible interest. Rice's Toyota World, Inc. v. Comnmissioner, 752 F.2d at 96. The promissory notes at issue are unsecured beyond the value of petitioners' partnership interests. Furthermore, the terms of the agreement between Salem and Cannel City protect petitioners from liability for nonpayment on the promissory notes. Finally, Salem could not assign the promissory notes to a third party and thus the notes had no economic value for Salem. Petitioners argue that, on their faces, the promissory notes are full recourse and binding but we conclude that, when viewed in conjunction with the remainder of the transaction, *642 Salem's right to receive payment from petitioners was wholly illusory. Any payments made were voluntary contributions to shore up the faltering structure; they were not interest on amounts unconditionally obligated to be paid. Furthermore, when the limited partners ceased making interest payments in 1982, Salem took no steps against petitioners to enforce the promissory notes and took only limited action against Hall. If a notemaker can stop paying interest and principal without repercussions in circumstances in which the note was issued in a venture doomed from the start, we can conclude that the note never represented an unconditional obligation to pay. We find that the promissory notes executed by petitioners did not represent genuine debt and that respondent correctly disallowed the amounts deducted. The third issue we must decide is whether all petitioners are liable for additions to tax and additional interest. Respondent determined additions to tax for negligence against the Davises, additional interest for substantial underpayment of tax against all petitioners, and an addition to tax for a substantial understatement against the Endicotts. The Commissioner determined *643 an addition to tax for the Davises for negligence under section 6653(a) for the taxable year 1980, and under section section 6653(a)(1) and section 6653(a)(2) for taxable years 1981 and 1982. For purposes of sections 6653(a), negligence is lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In deciding to invest in Cannel City, the Davises relied upon the advice of their attorney, Climaco, as they had for several years. Mr. Davis testified that as he approached the age of 65, he became concerned with generating post-retirement income. Climaco was aware of the Davis' concerns and recommended the Cannel City investment. In addition to Climaco's advice, the Davises relied on the Memorandum to inform them of Cannel City's value as an investment. The Memorandum stated that there were sufficient coal reserves to support the royalty obligations and that mining and selling the canneloid coal would be profitable. Although the Memorandum warned potential investors that the risks *644 were high, it did not reflect the inexperience of those who were responsible for the venture or of its certain failure. When information comes by way of a trusted and long-term adviser upon whose advice one has been able to rely in the past, and a reasonable reading of information provided by the adviser does not alert the investor that the information it conveys is untrue, it is reasonable to rely on such information without taking extreme and expensive steps to verify it. Consequently, we conclude that the Davises are not liable for additions to tax for negligence under sections 6653(a), 6653(a)(1), and 6653(a)(2). The Commissioner further determined additional interest under section 6621(c)[9] for all petitioners for each of their taxable years in issue. Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(a) if there is a substantial underpayment in any taxable year attributable to one or more tax-motivated transactions of at least $ 1,000. The increased rate applies to interest accrued after December 31, 1984, even though *645 the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c)(3)(A)(v) includes "any sham or fraudulent transaction" in the definition of tax-motivated transactions. We have historically interpreted the language "sham and fraudulent transaction" to mean transactions which were devoid of economic substance. Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom., Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom., Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom., Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Sammy Davis, Jr., Virginia Endicott, *646 and Eric Ball each testified at trial that they had invested in Cannel City in order to make a profit. Nonetheless, their motives do not imbue a financially doomed transaction with economic substance. Cherin v. Commissioner, 89 T.C. 986, 1000 (1987). Because we have concluded that the entire Cannel City investment is devoid of economic substance, and thus a sham, we also sustain the Commissioner's determinations of additional interest under section 6621(c). In his answer, respondent determined an addition to tax under section 6661[10] for the Endicotts for taxable year 1982. Section 6661 imposes an addition to tax equal to 25 percent of the entire underpayment for any taxable year in which there is a substantial understatement in income tax. Respondent bears the burden of proof because he first raised the issue in his answer. Zirker v. Commissioner, 87 T.C. 970 (1986); Rule 142(a), Tax Court Rules of Practice and Procedure.
*647 An understatement is substantial if the amount of the understatement exceeds the greater of 10 percent of the amount required to be shown on the return or $ 5,000. Sec. 6661(b)(1). An understatement is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Woods v. Commissioner, 91 T.C. 88 (1988). On their Federal income tax return for 1982, the Endicotts reported a tax liability of only $ 383. The amount of actual tax liability which should have been reported on the return was $ 50,016. The underpayment, in the amount of $ 49,178, exceeds both 10 percent of the correct tax liability and $ 5,000. If the taxpayer has substantial authority for the tax treatment of any item on his return, the understatement is reduced by the amount attributable to such items. Sec. 6661(b)(2)(B)(i). Furthermore, if the taxpayer adequately disclosed on his return the relevant facts pertaining to any tax item, the amount of the understatement *648 is reduced by the amount of such items. Sec. 6661(b)(2)(B)(ii). If the tax item is attributable to a tax shelter, however, the amount of understatement may only be reduced where there is substantial authority for the taxpayer's position and the taxpayer reasonably believed his tax treatment of such item was more likely than not the proper treatment. Sec. 6661(b)(2)(C)(i)(II). Respondent contends, and we agree, that the tax items pertaining to the Endicott's Cannel City investment are tax shelter items. A tax shelter is defined as a partnership, entity, plan, or arrangement whose principal purpose is the avoidance or evasion of Federal income tax. Sec. 6661(b)(2)(C)(ii). The definition of a tax shelter thus directs our analysis to the purpose of the "partnership, entity, plan, or arrangement," rather than to the subjective motivation of the individual investors. Although the principal purpose of a plan may be difficult to discern, it is clear that when profit is not one of a plan's possible outcomes and the tax benefits sought are substantial, the plan's principal purpose is tax avoidance or evasion. As we decided above, the Cannel City plan to mine and sell coal had no economic *649 substance and no realistic expectation of profit. Because the plan could not generate a profit, it is a tax shelter within the meaning of section 6661 regardless of petitioners' personal motivations. See Tweeddale v. Commissioner, 92 T.C. 501, 507 (1989). If an item is attributable to a tax shelter, the understatement can be reduced if there is or was substantial authority for the treatment of that item and if the taxpayer reasonably believed that the tax treatment of that item was more likely than not the proper treatment. Sec. 6661(b)(2)(C)(i)(II). These two tests are conjunctive. The types of authority which may be relied on to show that substantial authority exists or existed include the Internal Revenue Code and its temporary or final regulations, cases, administrative pronouncements, treaties, and legislative history. Section 1.6661-3(b)(2), Income Tax Regs. The Endicotts had no such authority. They relied solely on the advice of their tax adviser, which is specifically excluded from the list of acceptable authorities. We conclude *650 that the Endicotts did not have substantial authority for their treatment of tax shelter items on their 1982 income tax return. We need not address whether they reasonably believed that those items were more likely than not properly treated. We conclude that respondent has met his burden of proof, and his determination of an addition to tax under section 6661 for the Endicotts' 1982 taxable year will be sustained. In light of the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Kenneth M. and Virginia Endicott, docket No. 47504-86; Eric W. and Susan A. Ball, docket No. 21136-87; and Sammy Davis, Jr. and Altovise Davis, docket No. 35615-87.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. ↩
3. For taxable years 1981 and 1982, the determination is pursuant to section 6653(a) (1); for 1981 and 1982 the Commissioner also determined an addition to tax on an underpayment equal to the determined deficiency in each year pursuant to section 6653(a)(2)↩.
4. Among other concessions by the Commissioner and the Davises, including settlement of the deficiencies for taxable years 1978 and 1979, the Commissioner conceded an addition to tax pursuant to section 6659 for 1982 and the Davises agreed that they were liable for failure to timely file for 1982 pursuant to section 6651(a)(1).↩
5. The Memorandum made no attempt to justify the discrepancy in the two proposed sales prices of 50 cents per pound and $ 200 per ton. Hall explained at trial that bagged coal would be sold for 10 cents per pound or $ 200 per ton and coal logs would be sold for 50 cents per pound.↩
6. A parting is a seam of other substances running through a larger seam of coal.↩
7. Hall testified that he had planned all along to market the coal as coal logs but the first expression of this plan is in the second Memorandum.↩
8. There is no evidence in the record on the terms of Salem's lease of the Morgan Reserves.↩
9. Section 6621(d) was renumbered as section 6621(c)↩ by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744.
10. Section 6661 was added to the Code by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, section 323(a), 96 Stat. 613-614 and made applicable to returns the due date of which was after December 31, 1982. In 1983, section 6661(a) provided for an addition to tax equal to 10 percent of an underpayment of tax attributable to a substantial understatement of income tax. The rate was subsequently increased to 25 percent and made applicable to additions assessed after October 21, 1986. Pallottini v. Commissioner, 90 T.C. 498↩ (1988).