T.C. Memo. 1996-342


UNITED STATES TAX COURT


ESTATE OF RONALD BUSCH, DECEASED, ROCHELLE BUSCH, EXECUTRIX AND
ROCHELLE BUSCH, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 599-89, 1643-89, 618-90.      Filed July 30, 1996.


<u>Steven E. Plotnick</u>, for petitioners in docket No. 599-89.

<u>Michael S. Etkin</u>, <u>Jeffrey A. Schantz</u>, and <u>Roger S. Blane</u>,

for petitioner in docket Nos. 1643-89 and 618-90.

<u>Barry J. Laterman</u>, for respondent in docket No. 599-89.

<u>Paul Colleran</u>, <u>Mary P. Hamilton</u>, <u>John C. Galluzo Jr.</u>, and

<u>Mae J. Lew</u>, for respondent in docket Nos. 1643-89 and 618-90.


---

[1]     Cases of the following petitioner are consolidated herewith:
Richard E. Snyder, docket Nos. 1643-89, 618-90.

CONTENTS

Page

MEMORANDUM FINDINGS OF FACT AND OPINION........................2
OPINION OF THE SPECIAL TRIAL JUDGE............................3
FINDINGS OF FACT.............................................6
    A. The Plastics Recycling Transactions.....................6
    B. The Partnerships......................................9
    C. Stuart Becker.......................................12
    D. Petitioners and Their Introduction to the
       Partnership Transactions.............................16
OPINION.....................................................20
    A. Section 6653(a)--Negligence..........................23
       1.   The So-Called Oil Crisis.........................25
       2.   Petitioners' Purported Reliance on Becker
           and Miller.......................................29
           a.   The Circumstances Under Which a Taxpayer
              May Avoid Liability Under Section 6653(a)(1)
              and (2) Because of Reasonable Reliance on
              Competent and Fully Informed Professional
              Advice.......................................31
           b.   Miller.......................................33
           c.   Becker.......................................38
           d.   Conclusion as to Petitioners' Alleged
              Reliance on Becker and Miller................38
       3.   The Private Offering Memoranda...................42
       4.   Miscellaneous....................................46
       5.   Conclusion as to Negligence......................49
    B. Section 6659--Valuation Overstatement..................50
       1.   Concession of the Deficiency.....................51
       2.   Section 6659(e)..................................55

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.  They were tried and briefed separately but consolidated for purposes of opinion. Docket Nos. 1643-89 and 618-90, each of which concerns petitioner Richard E. Snyder, were consolidated for purposes of trial, briefing, and opinion.  All section references are to the Internal Revenue Code in effect for the years in issue, unless

otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The underlying transactions in these cases are substantially identical to the transaction considered in the Provizer case.

In two notices of deficiency, one dated October 27, 1988, and the other dated October 12, 1989, respondent determined deficiencies in the 1981 and 1982 Federal income taxes of petitioner Snyder in the respective amounts of $102,459 and $118,307, plus an addition to tax for 1982 in the amount of $26,211 under section 6661 for substantial understatement of tax. In a notice of deficiency dated October 11, 1988, respondent determined a deficiency in the joint 1982 Federal income tax of petitioners Busch in the amount of $52,420. In these three notices of deficiency, respondent also determined additions to tax as follows:

| Docket Nos. | Petitioners | Year | Additions to Tax Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
|---|---|---|---|---|---|
| 599-89 | Busch | 1982 | $2,621 | [1] | $15,726 |
| 1643-89 | Snyder | 1981 | 5,123 | [1] | 30,738 |
| 618-90 | Snyder | 1982 | 5,915 | [1] | 31,453 |

[1]     50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.

In addition, respondent determined in each notice of deficiency that interest on deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c).

With respect to petitioner Snyder, in her posttrial brief respondent asserted a lesser deficiency[2] for 1982 and lesser additions to tax for 1981 and 1982.  She reduced the 1982 deficiency to $109,133; the addition to tax under section 6653(a)(1) for 1982 to $5,242; and the addition to tax under section 6659 for both 1981 and 1982 to $24,783 and $25,114, respectively.  In addition, respondent conceded that Snyder is not liable for the section 6661 addition to tax for taxable year 1982.  She also noted that the addition to tax under section 6659 for the years 1981 and 1982 is to be applied only to the portions of the deficiencies attributable to the disallowed credits from

[2]     Part of the deficiency determined for 1982 was due to respondent's disallowance of a portion of alimony payments and $20,147 in farming activity losses claimed by Snyder.  The parties filed a Stipulation of Settled Issues with respect to these items on March 28, 1994.  Respondent conceded the alimony deduction in full and $11,566 of the farming activity losses, while Snyder conceded $8,581 of the farming activity losses. Respondent also conceded that no portion of any underpayment resulting from the $8,581 of disallowed farming activity losses is subject to the additions to tax under secs. 6653(a) and 6659.

SAB Resource Recovery Associates and SAB Resource Reclamation Associates, and that for taxable year 1982 only $104,842 of the total deficiency is subject to the increased rate of interest under section 6621(c). We consider the amounts in dispute in docket Nos. 1643-89 and 618-90 to be adjusted accordingly.

Stipulations of Settled Issues with respect to petitioners' participation in the Plastics Recycling Program were filed in each of these consolidated cases. Petitioners each stipulated the following:[3]

> 1. Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits, or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.
>
> 2. The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. section 6621(c), formerly section 6621(d).
>
> 3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to tax for negligence under the applicable provisions of I.R.C. section 6653(a).

---

[3] Petitioner Snyder's stipulation of settled issues is written in the singular, and express reference is made to SAB Resource Recovery Associates and SAB Resource Reclamation Associates, instead of "the Plastics Recycling Program". In addition, respondent agreed not to assert the sec. 6661 addition to tax in the Snyder cases.

In addition, petitioners Busch conceded their liability for the section 6659 addition to tax. With respect to petitioners Busch, in her trial memorandum respondent reduced the addition to tax under section 6659 to $12,557. The Stipulation of Settled Issues does not indicate the final settled amount. Petitioner Snyder agreed not to contest the value of the Sentinel EPE recycler and conceded the existence of a valuation overstatement on his returns, but preserved his right to contest the issue of whether respondent should have waived the addition to tax under the provisions of section 6659(e).

The issues in these consolidated cases are: (1) Whether petitioners are liable for additions to tax under section 6653(a)(1) and (2); and (2) whether petitioner Snyder is liable for the addition to tax under section 6659 for underpayments of tax attributable to valuation overstatements. Snyder's counsel raised a statute of limitations issue but specifically conceded that issue in their reply brief.

FINDINGS OF FACT

Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference.

A. The Plastics Recycling Transactions

These cases concern petitioners' investments in two limited partnerships that leased Sentinel expanded polyethylene (EPE) recyclers: SAB Resource Reclamation Associates (SAB Reclamation)

and SAB Resource Recovery Associates (SAB Recovery). Petitioners Richard E. Snyder and Ronald Busch were limited partners in both SAB Reclamation and SAB Recovery. For convenience we refer to these partnerships collectively as the Partnerships.

The transactions involving the Sentinel EPE recyclers leased by the Partnerships are substantially identical to those in the Clearwater Group limited partnership (Clearwater), the partnership considered in Provizer v. Commissioner, supra. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In the Provizer case, Packaging Industries, Inc. (PI) manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each. ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each. F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in the above transactions offset each other. These transactions

were done simultaneously.  Although the recyclers were sold and leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap.  The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, each of the Partnerships was formed to lease Sentinel EPE recyclers from F & G Corp. and license those recyclers to FMEC Corp.[4]  The transactions of the Partnerships differ from the underlying transaction in the Provizer case in the following respects:  (1) The entity that leased the machines from F & G Corp. and licensed them to FMEC Corp.; and (2) the number of recyclers the Partnerships were organized to lease and license.[5]  For convenience we refer to the series of transactions

---

[4]     In the stipulation of facts for petitioners Busch, the parties stipulated that in 1982 SAB Recovery was also a partner in the partnerships known as Scarborough Leasing Associates (Scarborough) and Plymouth Equipment Associates (Plymouth). Scarborough and Plymouth purported to lease Sentinel EPE recyclers in transactions substantially identical to those in the Clearwater Group limited partnership.

[5]     According to the offering memoranda, SAB Reclamation was to lease and license eight recyclers and SAB Recovery was to lease and license seven recyclers.  However, the SAB Reclamation partnership tax return for 1982 indicates that it leased and licensed only four recyclers.  The SAB Recovery partnership tax
(continued...)

among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp., and PI as the Partnership transactions.  In addition to the Partnership transactions, a number of other limited partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene recyclers.  We refer to these collectively as the Plastics Recycling transactions.

B.  The Partnerships

SAB Recovery and SAB Reclamation are New York limited partnerships that were organized and promoted in 1981 and 1982, respectively, by Stuart Becker (Becker), a certified public accountant (C.P.A) and the founder and principal owner of Stuart Becker & Co., P.C. (Becker Co.), an accounting firm that specialized in tax matters.  Becker organized a total of six recycling partnerships (the SAB Recycling Partnerships).  Two of the SAB Recycling Partnerships closed in late 1981, two closed in early 1982, and two more closed in late 1982.

The general partner of each of the SAB Recycling Partnerships, including SAB Reclamation and SAB Recovery, is SAB Management Ltd. (SAB Management).  SAB Management is wholly owned

---

⁵(...continued)
return for 1981 indicates that it leased and licensed at least seven recyclers.  Two statements attached to the return reference seven recyclers with a fair market value of $8,138,667, but another attachment references a basis in recyclers of $9,212,401. The source of the alleged additional basis is unclear from the record.

by Scanbo Management Ltd. (Scanbo), which is wholly owned by Becker. Scanbo is an acronym for three of Becker's children: Scott, Andy, and Bonnie. The officers and directors of SAB Management and Scanbo are as follows: (1) Becker, president and director; (2) Noel Tucker (Tucker), vice president, treasurer, and director; and (3) Steven Leicht (Leicht), vice president, secretary, and director. During the years in issue, Tucker and Leicht also worked at Becker Co. Tucker was vice president. Each owned up to 7 percent of the stock of Becker Co. SAB Management did not engage in any business before becoming involved with the SAB Recycling Partnerships.

With respect to each of the Partnerships, a private placement memorandum was distributed to potential limited partners.[6] Reports by F & G Corp.'s evaluators, Dr. Stanley M. Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z. Burstein (Burstein), a mathematics professor, were appended to the offering memoranda. Ulanoff owns a 1.27-percent interest in Plymouth Equipment Associates and a 4.37-percent interest in Taylor Recycling Associates, partnerships that leased Sentinel recyclers. Burstein owns a 2.605-percent interest in Empire

---

[6] The offering memoranda for SAB Reclamation and SAB Recovery were submitted into the records in docket Nos. 1643-89 and 618-90, the Snyder cases, but not in docket No. 599-89, the Busch case. Petitioners Busch stipulated to the relevant portions of the offering memoranda. Those portions not so stipulated, but referenced herein, have been disregarded for purposes of docket No. 599-89.

Associates and a 5.82-percent interest in Jefferson Recycling Associates, also partnerships that leased Sentinel recyclers. Burstein also was a client and business associate of Elliot I. Miller (Miller), the corporate counsel to PI.

The offering memoranda of SAB Reclamation and SAB Recovery provide that SAB Management will receive general partner fees in the respective amounts of $110,000 and $97,800 from those partnerships. SAB Management received fees of approximately $500,000 as the general partner of the SAB Recycling Partnerships. In addition, Becker Co. prepared the partnership returns and Forms K-1 for all of the SAB Recycling Partnerships and received fees for those services.

The offering memoranda of SAB Reclamation and SAB Recovery state that sales commissions and offeree representative fees will be paid in amounts equal to 7.5 percent of each investment guided to the partnerships and that SAB Management, as the general partner of those partnerships, may retain as additional compensation all amounts not so paid. However, neither Becker nor SAB Management retained or received any sales commissions or offeree representative fees. Instead, after the closing of each SAB Recycling Partnership, Becker rebated to each investor whose investment was not subject to a sales commission or offeree representative fee an amount equal to 7.5 percent of such investor's original investment.

The offering memoranda list significant business and tax risk factors associated with investments in the Partnerships. Specifically, the offering memoranda state: (1) There is a substantial likelihood of audit by the Internal Revenue Service (IRS) and the purchase price paid by F & G Corp. to ECI Corp. probably will be challenged as being in excess of fair market value; (2) the Partnerships have no prior operating history; (3) the general partner has no prior experience in marketing recycling or similar equipment; (4) the limited partners have no control over the conduct of the Partnerships' business; (5) there is no established market for the Sentinel EPE recyclers; (6) there are no assurances that market prices for virgin resin will remain at its current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.

C.  Stuart Becker

Becker does not have an engineering background, and he is not an expert in plastics materials or plastics recycling. He received a B.S. degree in accounting from New York University in 1964 and an M.B.A. in taxation from New York University Graduate School of Business Administration in 1973. He passed the certified public accountancy test in 1967 and was the winner of the gold medal, awarded for achieving the highest score on the examination for that year. Since early 1966, Becker has practiced as an accountant exclusively in the tax area. From

1964 until 1972 he worked for the accounting firm of Touche, Ross & Co., and in 1972 he joined the accounting firm of Richard A. Eisner & Co. as the partner in charge of the tax department. In 1977, Becker founded Becker Co.

Becker had considerable experience with tax shelter transactions before he organized the SAB Recycling Partnerships. He prepared opinions regarding tax shelters' economic and tax projections, advised individuals and companies with respect to investments in tax shelters, lectured extensively about tax shelter investments generally, and lectured and published with respect to leveraged tax shelters. Becker described a leveraged tax shelter as "a transaction where [the ratio of] the effective [tax] writeoff, which includes the value of the tax credit, * * * [to the amount invested] exceeds one to one." Becker Co. specialized in tax advantaged investments. From 1980 to 1982, approximately 60 percent of the work done by Becker Co. involved tax sheltered and private investments. Becker has owned minority interests in general partners of numerous limited partnerships. Prior to organizing the SAB Recycling Partnerships, Becker owned 5 percent of the general partner of partnerships involved in approximately 14 transactions concerning river transportation (such as barges, tow boats, and grain elevators).

Although investment counseling was related to his firm's line of business, Becker did not consider himself in the business of providing investment advice. Becker did not normally hire

other professionals for consultation or advice. In circumstances where he believed there was a need for outside advice, he would so advise the client. Between 30 and 40 of Becker's clients invested in the Plastics Recycling partnerships.

Becker learned of the Plastics Recycling transactions when a prospective client presented him with an offering memorandum concerning the transactions in August or September 1981. Becker reviewed the offering memorandum and spoke to Miller, one of the key figures in the transactions and an acquaintance of Becker's. Miller was a shareholder of F & G Corp. and, as noted, the corporate counsel to PI. Thereafter, Becker recommended the investment to the prospective client. Although the prospective client did not invest in the Plastics Recycling transactions, Becker became interested in the proposal and organized the SAB recycling partnerships in order to make similar investments in Sentinel EPE recyclers conveniently available to appropriate clients.

In organizing the SAB Recycling Partnerships, Becker was not allowed to change the format of the transactions or the purchase, lease, or licensing prices of the Sentinel EPE recyclers. He was allowed only to conduct a limited investigation of the proposed investments and choose whether or not to organize similar partnerships. Becker relied heavily upon the offering materials and discussions with persons involved in the matter to evaluate the Plastics Recycling transactions. He and two other members of

Becker Co., Leicht and Tucker, investigated PI and visited their plant in Hyannis, Massachusetts, where they saw the Sentinel EPE recyclers. Tucker and Leicht did not testify at trial.

During his investigation of the Plastics Recycling transactions, Becker did not hire any plastics, engineering, or technical experts, or recommend that his clients do so. Becker discussed the transactions with Michael Canno (Canno), of the Equitable Bag Co., a manufacturer of paper and plastic bags. Canno never saw the recyclers or the pellets and never wrote any reports assessing the equipment or the pellets. In addition, Becker retained a law firm, Rabin & Silverman, to assist him in organizing the SAB Recycling Partnerships. See Spears v. Commissioner, T.C. Memo. 1996-341, to the effect that in employing the law firm, Becker particularly sought to protect himself against liability.

After the 1981 SAB Recycling Partnerships closed, Becker had an accountant sent to PI to confirm, by serial number, that as of December 31, 1981, the equipment that was leased to the 1981 SAB Recycling Partnerships was indeed available for use. Becker arranged for this verification, independent of PI, because he understood that the investment tax and business energy credits would not be available if the qualifying property was not available for use.

D.  Petitioners and Their Introduction to the Partnership
Transactions

Petitioner Richard E. Snyder (Snyder) resided in Cross River, New York, when his petition was filed.  He is a graduate of Tufts University with a B.A. in economics.  Snyder has enjoyed a very successful career with the publishing company Simon & Schuster, Inc. (Simon & Schuster).  He worked for Simon & Schuster for 33 years, up until the midpoint of 1994.  For about the latter 20 of those years, including the taxable years in issue, he was chairman and chief executive officer (CEO) of Simon & Schuster.  As chairman and CEO, he was responsible for all of the policies and practices of the corporation, all of its mergers and acquisitions, and all personnel policies and strategic planning.  Snyder oversaw roughly 75 acquisitions on behalf of Simon & Schuster, involving sums ranging from less than $1 million to $800 million.

Petitioner Ronald Busch (Busch) died prior to trial.  He and his wife Rochelle resided in New York, New York, at the time their petition was filed.  During 1982 Busch was the president and publisher of Pocket Books, the paperback division of Simon & Schuster.

On his 1981 and 1982 Federal income tax returns, Snyder reported gross income from wages, interest, dividends, State and local tax refunds, and capital gains in excess of $700,000 and $800,000, respectively.  During the years in issue, petitioner

Snyder filed joint Federal income tax returns with his former wife, Joni Evans Snyder.  She is not a party to these cases.  On their joint 1982 Federal income tax return, Ronald and Rochelle Busch reported gross income from wages, interest, dividends, and State and local tax refunds in excess of $370,000.  Consequently, in the absence of significant deductions or credits, petitioners in these consolidated cases were subject to payment of Federal income taxes in substantial amounts.

In 1981, Snyder acquired a 4.479638-percent limited partnership interest in SAB Recovery for $50,000.  This amount is the gross amount Snyder invested, unreduced by any sales commission rebates or his share of any advance royalty distributed to him.  On his 1981 return, Snyder claimed an operating loss in the amount of $39,698 and investment tax and business energy credits totaling $82,536,[7] both flowing from his interest in SAB Recovery.  In 1982, Snyder acquired a 9-percent interest in SAB Reclamation, also for $50,000.  On his 1982 return, he claimed an operating loss in the amount of $40,100 and investment tax and business energy credits totaling $83,712, both as a result of his investment in SAB Reclamation.  Snyder also claimed an operating loss in the amount of $2,291 with respect to SAB Recovery in 1982.  Respondent disallowed Snyder's claimed

---

[7]    The regular investment tax credit claimed by Snyder totaled $41,342, but only $41,268 of that amount was attributable to SAB Recovery.

1981 and 1982 operating losses and credits related to his investments in SAB Recovery and SAB Reclamation.[8]

During 1982, Busch acquired a 4.5-percent interest in SAB Reclamation for $25,000. This amount is the gross amount Busch invested, unreduced by any sales commission rebate or his share of any advance royalty distributed to him. On their 1982 return, he and his wife claimed an operating loss in the amount of $20,050 and investment tax and business energy credits totaling $41,856 with respect to his investment in SAB Reclamation. They also claimed an operating loss in the amount of $1,145 with respect to a 2.239819-percent interest Busch owned in SAB Recovery. Respondent disallowed all but $65.60 of their claimed operating losses and all of their credits related to the investments in SAB Reclamation and SAB Recovery.

Sometime in the late 1970's, Snyder hired Becker to be his accounting and financial adviser. During that time Snyder introduced Becker to Busch, who soon thereafter also became a client of Becker's firm. In 1981 Becker introduced the Partnership transactions to Snyder. Becker believed that the Partnership transactions would appeal to Snyder because Snyder

---

[8]    Snyder reported a total loss in 1982 from his partnership interests in the amount of $124,012. In an attached statement itemizing those losses, Snyder reported a loss from SAB Recovery in the amount of $2,291. In the notice of deficiency, however, respondent indicates that Snyder reported an operating loss of $2,160 from SAB Recovery and disallowed that amount in full. The reason for this discrepancy is unclear from the record.

had significant income. Busch learned about the Partnership transactions from Tucker. After reviewing the offering materials, Snyder arranged a meeting with Becker in his office at Simon & Schuster. Busch also attended this meeting. Snyder knew that Becker was not an expert in plastics recycling or engineering.

At the meeting in Snyder's office, Snyder and Busch asked Becker about the economic and tax aspects of the Partnership transactions. Becker provided them with all of the information that was available to him. He told them that he had spoken to Canno, that he had visited PI's plant in Hyannis, that the Sentinel EPE recycler did in fact exist, and that he had seen it in operation. Becker also told them that he had checked the price of pellets in plastics industry trade journals. He told Busch that he believed that there was a market for the recycler. Becker also indicated that he agreed with the tax opinion included in the offering materials.

Snyder also spoke with Miller. Miller and Snyder are former college classmates and fraternity brothers. Although the two had not spoken to each other since 1955, Snyder recognized Miller's name in the offering materials and decided to contact him about the recyclers. Snyder claimed that Miller spoke approvingly of the Partnership transactions and, with respect to PI, said "that he invested his future in this company". Miller also indicated

that his family had invested in Plastics Recycling transactions. Snyder did not seek advice from anyone other than Becker and Miller. The tax and business risks detailed in the offering materials did not concern Snyder. His position is that he believed that any investigation on his part would be redundant and a waste of money.

As for Busch, the record is devoid of any indication that he made any effort independently to investigate the Partnership transactions beyond attending the meeting with Snyder and Becker.

Petitioners in these consolidated cases never made a profit in any year from their participation in the Partnership transactions. Snyder did not see a Sentinel EPE recycler prior to investing in the Partnership transactions, and there is nothing in the record to indicate that Busch ever saw one. Petitioners in each case do not have any education or work experience in plastics recycling or plastics materials.

OPINION

We have decided more than two dozen of the Plastics Recycling group of cases.[9] The majority of these cases, like the

---

[9] Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the substance of the partnership transaction and also the additions to tax.

The following cases concerned the addition to tax for negligence, inter alia: Spears v. Commissioner, T.C. Memo. 1996-341; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84; Bennett v. Commissioner, T.C.

(continued...)

consolidated cases herein, raised issues regarding additions to tax for negligence and valuation overstatement.  We have found the taxpayers liable for such additions to tax in all but one of the opinions to date on these issues, although procedural rulings have involved many more favorable results for taxpayers.[10]

---

[9](...continued)
Memo. 1996-14; <u>Atkind v. Commissioner</u>, T.C. Memo. 1995-582; <u>Triemstra v. Commissioner</u>, T.C. Memo. 1995-581; <u>Pace v. Commissioner</u>, T.C. Memo. 1995-580; <u>Dworkin v. Commissioner</u>, T.C. Memo. 1995-533; <u>Wilson v Commissioner</u>, T.C. Memo. 1995-525; <u>Avellini v. Commissioner</u>, T.C. Memo. 1995-489; <u>Paulson v. Commissioner</u>, T.C. Memo. 1995-387; <u>Zidanich v. Commissioner</u>, T.C. Memo. 1995-382; <u>Ramesh v. Commissioner</u>, T.C. Memo. 1995-346; <u>Reister v. Commissioner</u>, T.C. Memo. 1995-305; <u>Fralich v. Commissioner</u>, T.C. Memo. 1995-257; <u>Shapiro v. Commissioner</u>, T.C. Memo. 1995-224; <u>Pierce v. Commissioner</u>, T.C. Memo. 1995-223; <u>Fine v. Commissioner</u>, T.C. Memo. 1995-222; <u>Pearlman v. Commissioner</u>, T.C. Memo. 1995-182; <u>Kott v. Commissioner</u>, T.C. Memo. 1995-181; <u>Eisenberg v. Commissioner</u>, T.C. Memo. 1995-180.

   <u>Greene v. Commissioner</u>, 88 T.C. 376 (1987), concerned the applicability of the safe-harbor leasing provisions of sec. 168(f)(8).  <u>Trost v. Commissioner</u>, 95 T.C. 560 (1990), concerned a jurisdictional issue.

   <u>Farrell v. Commissioner</u>, T.C. Memo. 1996-295; <u>Baratelli v. Commissioner</u>, T.C. Memo. 1994-484; <u>Estate of Satin v. Commissioner</u>, T.C. Memo. 1994-435; <u>Fisher v. Commissioner</u>, T.C. Memo. 1994-434; <u>Foam Recycling Associates v. Commissioner</u>, T.C. Memo. 1992-645; and <u>Madison Recycling Associates v. Commissioner</u>, T.C. Memo. 1992-605, concerned other issues.

[10]    In <u>Zidanich v. Commissioner</u>, T.C. Memo. 1995-382, we held the taxpayers liable for the sec. 6659 addition to tax, but not liable for the negligence additions to tax under sec. 6653(a).  As indicated in our opinion in that case, the <u>Zidanich</u> case, and the <u>Steinberg</u> case consolidated with it for opinion, involved exceptional circumstances.

   In <u>Estate of Satin v. Commissioner</u>, <u>supra</u>, and <u>Fisher v. Commissioner</u>, <u>supra</u>, after the decision in <u>Provizer v. Commissioner</u>, <u>supra</u>, the taxpayers were allowed to elect to accept a beneficial settlement because of exceptional circumstances.  In <u>Farrell v. Commissioner</u>, <u>supra</u>, we rejected

(continued...)

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the transaction, which is almost identical to the Partnership transactions in these consolidated cases, was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that the investments in the Sentinel EPE recyclers in these cases are similar to the investment described in Provizer v. Commissioner, supra. The

---

[10](...continued)
taxpayers' claim to a similar belated settlement arrangement since the circumstances were different and taxpayers previously had rejected settlement and elected to litigate the case. See also Baratelli v. Commissioner, supra.

underlying transactions in these consolidated cases, and the Sentinel EPE recyclers considered in these cases, are the same type of transaction and same type of machine considered in Provizer v. Commissioner, supra.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and petitioners' testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in the respective stipulations of settled issues filed shortly before trial. The record plainly supports respondent's determination regardless of such concessions. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

A.  Section 6653(a)--Negligence

In each of the notices of deficiency, respondent determined that petitioners are liable for the negligence additions to tax under section 6653(a)(1) and (2) for the respective taxable years in issue. Petitioners have the burden of proving that respondent's determination is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment. McPike v. Commissioner, T.C. Memo. 1996-46. Compare Spears v. Commissioner, T.C. Memo. 1996-341, with Zidanich v. Commissioner, T.C. Memo. 1995-382.

When petitioners invested in the Partnerships, they had no education or experience in plastics materials or plastics recycling, nor had any of them seen a Sentinel EPE recycler. Petitioners contend that they were reasonable in claiming

deductions and investment credits with respect to their investments in the Partnerships.  In support of such contentions, petitioners argue, in general terms:  (1) That claiming the deductions and credits with respect to the Partnerships was reasonable in light of the so-called oil crisis during the years in issue; and (2) that they reasonably relied upon the offering materials and a qualified adviser.  Busch's estate claims that Busch relied exclusively on Becker, while Snyder claims to have relied on both Becker and Miller.

### 1.  The So-Called Oil Crisis

Petitioners argue that they reasonably believed that the Partnership transactions had good economic potential because of the alleged oil crisis in the United States during 1981.  Snyder contends that he knew that plastics were oil derivatives and that his decision to invest was influenced by the media coverage of the supposed oil crisis and the Federal Government's energy conservation policy at the time.  In his posttrial brief, counsel for Busch's estate also refers to the so-called oil crisis as a factor influencing Busch's decision to invest.

Petitioners fail to explain, however, exactly how the so-called oil crisis, or the media coverage thereof, provided a reasonable basis for them to invest in the Partnerships and claim the associated tax deductions and credits.  The offering materials warned that there could be no assurances that prices

for new resin pellets would remain at their then current level.
Both petitioners stipulated that information published prior to
the Sentinel EPE Recycling transactions indicated that the price
of polyethylene was declining during the fourth quarter of 1981.
One of respondent's experts, Steven Grossman, explained that the
price of plastics materials is not directly proportional to the
price of oil. In his report, he testified that less than 10
percent of crude oil is utilized for making plastics materials,
and that studies have shown that "a 300% increase in crude oil
prices results in only a 30 to 40% increase in the cost of
plastics products." Moreover, during 1980 and 1981, in addition
to the media coverage of the so-called oil crisis, there was
"extensive continuing press coverage of questionable tax shelter
plans." Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir.
1984), affg. 79 T.C. 714 (1982).

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132
(1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024
(10th Cir. 1994), and Rousseau v. United States, 71A AFTR 2d 93-
4294, 91-1 USTC par. 50,252 (E.D. La. 1991), is misplaced. The
facts in Krause v. Commissioner, supra, are distinctly different
from the facts of these cases. In the Krause case, the taxpayers
invested in limited partnerships whose investment objectives
concerned enhanced oil recovery (EOR) technology. The Krause
opinion states that during the late 1970's and early 1980's, the

Federal Government adopted specific programs to aid research and development of EOR technology.  Id. at 135-136.  In holding that the taxpayers in the Krause case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology."  Id. at 177.  In the present cases, however, as explained by respondent's expert Steven Grossman, supra, the price of plastics materials was not directly proportional to the price of oil, and there is no persuasive evidence that the so-called oil crisis had a substantial bearing on petitioners' decision to invest.  While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in these records that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.

Moreover, the taxpayers in the Krause opinion were experienced in or investigated the oil industry and EOR technology specifically.  One of the taxpayers in Krause v. Commissioner, supra, undertook significant investigation of the proposed investment including researching EOR technology.  The other taxpayer was a geological and mining engineer whose work

included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166. In the present cases, petitioners had no education or work experience with respect to plastics or plastics recycling. Petitioners did not independently investigate the Sentinel EPE recyclers, nor did they hire an expert in plastics to evaluate the Partnership transactions.

In Rousseau v. United States, supra, the property underlying the investment, ethanol producing equipment, was widely considered at that time to be a viable fuel alternative to oil, and its potential for profit was apparent. In addition, the taxpayer therein conducted an independent investigation of the investment and researched the market for the sale of ethanol in the United States. In contrast, as we noted in distinguishing the Krause case, there is no showing in these records that the so-called oil crisis would provide a reasonable basis for petitioners' investing in the polyethylene recyclers here in question. Petitioners did not independently investigate the Sentinel EPE recyclers or hire an expert in plastics to evaluate the Partnership transactions. The facts of petitioners' cases are distinctly different from the Rousseau case. We hold that petitioners' vague, general claims concerning the so-called oil crisis are without merit, and that the Krause and Rousseau cases are inapplicable.

## 2. Petitioners' Purported Reliance on Becker and Miller

Petitioners also maintain that they reasonably relied upon the advice of a qualified adviser. Busch's estate contends that he reasonably relied on Becker, while Snyder contends that he reasonably relied on Becker and Miller. In each of these cases, petitioners' investigation was limited to speaking to Becker, and in Snyder's case, Miller as well, in addition to reviewing the offering memoranda.

The concept of negligence and the argument of reliance on an expert are highly fact intensive. In these cases, two corporate leaders, experienced and able in finance and at investigating business proposals, assert that they relied upon their accountant to investigate the tax law and the underlying business circumstances of a proposed investment. The accountant, experienced in tax matters, explains that he made an investigation within the limits of his resources and abilities and fully disclosed what he had done. The question here is whether petitioners actually and reasonably relied on the accountant with respect to valuation problems requiring expertise in engineering and plastics technology or whether the accountant gave the tax advice and facilitated the transaction, but did not make a full and independent investigation of the relevant business and technology and did clearly inform his clients of the limits of his knowledge and investigation of the transaction.

For reasons set forth below, we believe the latter statement more accurately describes what happened here.

> ### a. The Circumstances Under Which a Taxpayer May Avoid Liability Under Section 6653(a)(1) and (2) Because of Reasonable Reliance on Competent and Fully Informed Professional Advice

A taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if he or she reasonably relied on competent professional advice. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that such professional had the expertise and knowledge of the pertinent facts to provide valuable and dependable advice on the subject matter. Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918, (9th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); see also Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence. Goldman v. Commissioner, supra; Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Goldman v. Commissioner, supra; Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985); Lax v. Commissioner, T.C. Memo. 1994-329, affd. without published opinion 72 F.3d 123 (3d Cir. 1995); Sacks v. Commissioner, supra; Steerman v. Commissioner, T.C. Memo. 1993-447; Rogers v. Commissioner, T.C. Memo. 1990-619; see also the Plastics Recycling cases cited supra note 8.

### b. Miller

Snyder and Miller are former college classmates and fraternity brothers who had not spoken to each other for nearly

25 years before discussing the Partnership transactions in 1981. Snyder claims that Miller told him that his future was invested in PI. The offering memoranda for SAB Recovery and SAB Reclamation disclosed that Miller was a 9.1-percent shareholder of F & G Corp., was employed as corporate counsel to PI, and represented Raymond Grant, the sole shareholder of ECI Corp. Each memorandum also noted that "Miller [would] receive substantial additional compensation for representing PI and FMEC in connection with" the Partnership transactions. Not surprisingly, Miller recommended SAB Recovery to Snyder.

Nothing in the records indicates that Miller had any expertise or knowledge with respect to plastics or plastics recycling, or that Snyder believed he had any such knowledge or expertise. There is no showing in the records that Snyder and Miller had any special or enduring friendship during college or afterwards; indeed, they had not spoken to each other in nearly 25 years before discussing the Partnership transactions. Given the extent to which Miller was immersed in the Partnership transactions, how much he stood to benefit financially, and his lack of expertise regarding plastics materials and plastics recycling, we do not find Snyder's purported reliance on Miller to be reasonable, in good faith, or based upon full disclosure. See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales

promotion;" see also Marine v. Commissioner, supra; McCrary v. Commissioner, supra; Rybak v. Commissioner, supra; Freytag v. Commissioner, supra; Lax v. Commissioner, supra; Steerman v. Commissioner, supra; Rogers v. Commissioner, supra.

### c. Becker

Becker possessed no education, special qualifications, or professional skills in plastics engineering, plastics recycling, or plastics materials. In evaluating the Plastics Recycling transactions and organizing the SAB Recycling Partnerships, Becker supposedly relied upon: (1) The offering materials; (2) a tour of the PI facility in Hyannis; (3) discussions with insiders to the transactions; (4) Canno; and (5) his investigation of the reputation and background of PI and persons involved in the transactions.

Despite his lack of knowledge regarding the product, the target market, and the technical aspects at the heart of the Plastics Recycling transactions, Becker did not hire an expert in plastics materials or plastics recycling, or recommend that his clients do so. The only independent person having any connection with the plastics industry that Becker spoke to was Canno. A client of Becker Co., Canno was a part owner and the production manager of Equitable Bag Co., a manufacturer of paper and plastic bags. Becker spoke to Canno about the recyclers and PI, but did not hire or pay him for any advice. Canno did not visit the PI

plant in Hyannis, see or test a Sentinel EPE recycler, or see or test any of the output from a Sentinel EPE recycler or the recycled resin pellets after they were further processed by PI. According to Becker, Canno endorsed the Partnership transactions after reviewing the offering materials. Asked at trial if Canno had done any type of comparables analysis, Becker replied, "I don't know what Mr. Canno did."

Becker visited the PI plant in Hyannis, toured the facility, viewed a Sentinel EPE recycler in operation, and saw products that were produced from recycled plastic. He claims that during his visit he was told that the recycler was unique and that it was the only machine of its type. In fact, the Sentinel EPE recycler was not unique, and information published prior to the Sentinel EPE recycling transactions indicated that several machines capable of densifying low density materials already were on the market. Other plastics recycling machines available during 1981 ranged in price from $20,000 to $200,000, including the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177.

Becker was also told that PI had put an enormous amount of research and development--10 to 12 years' worth--into the creation and production of the Sentinel EPE recycler. When he asked to see the cost records for some kind of independent

verification, however, his request was denied. Becker was informed that such information was proprietary and secret, and that he would just have to take PI's representations as true. Although PI claimed that all of its information was a trade secret, and that it never obtained patents on any of its machines, PI had in fact obtained numerous patents prior to the recycling transactions and had also applied for a trademark for the Sentinel recyclers. Becker decided to accept PI's representations after speaking with Miller (the corporate counsel to PI), Canno (who had never been to PI's plant or seen a Sentinel EPE recycler), and a surrogate judge from Rhode Island who did business in the Boston-Cape Cod area (and who had no expertise in engineering or plastics materials). Becker testified that he was allowed to see PI's internal accounting controls regarding the allocation of royalty payments and PI's recordkeeping system in general. In Provizer v. Commissioner, supra, this Court found that "PI had no cost accounting system or records."

Becker confirmed at trial that he relied on the offering materials and discussions with PI personnel to establish the value and purported uniqueness of the recyclers. Becker testified that he relied upon the reports of Ulanoff and Burstein contained in the offering materials, despite the fact: (1) Ulanoff's report did not contain any hard data to support his

opinion; (2) Ulanoff was not an economics or plastics expert; (3) Becker did not know whether Burstein was an engineer; and (4) Burstein was a client of Miller's and was not an independent expert. In addition, Ulanoff and Burstein each owned an interest in more than one partnership which owned Sentinel Recyclers as part of the Plastics Recycling Program.

At trial, Becker explained that in the course of his practice when evaluating prospective investments for clients, he focuses on the economics of the transaction and investigates whether there is a need or market for the product or service. With respect to the Partnership transactions, the record indicates that Becker overlooked several red flags regarding the economic viability and market for the Sentinel EPE recyclers. The offering memoranda for the Partnership transactions warned that there was no established market for the Sentinel EPE recyclers. Becker never saw any marketing plans for selling the pellets or leasing the recyclers. He accepted representations by PI personnel that they would be marketing the recyclers to clients and that there was a sufficient base of end-users for the machines, yet he never saw PI's client list. At the time of the closing of the Partnerships, Becker did not know who the end-users were or whether there were any end-users actually committed to the transaction.

Becker purportedly checked the price of the pellets by reading trade journals of the plastics industry. However, he did not use those same journals to investigate the recyclers' purported value or to see whether there were any advertisements for comparable machines. The records in these cases do not indicate that either Snyder or Busch asked to see those journals for their own perusal. In concluding that the Partnerships would be economically profitable, Becker made two assumptions that he concedes were unsupported by any hard data: (1) That there was a market for the pellets; and (2) that market demand for them would increase. In fact, as each petitioner stipulated, information published prior to the Sentinel EPE Recycling transactions indicated that the price of polyethylene was actually going down, not up, during the final quarter of 1981.

Becker also had a financial interest in SAB Reclamation and SAB Recovery. He received fees in excess of $500,000 with respect to the SAB Recycling Partnerships, more than $200,000 of which derived from SAB Reclamation and SAB Recovery. Becker also received fees from individual investors for investment advice. In addition, Becker Co. received fees from the SAB Recycling Partnerships for preparing their partnership returns. As Becker himself testified, petitioners could not have read the offering materials and been ignorant of the financial benefits accruing to him.

### d. Conclusion as to Petitioners' Alleged Reliance on Becker and Miller

Petitioners in these cases are both very well educated and highly accomplished, sophisticated businessmen. Within 15 years after starting with Simon & Schuster, Snyder was in charge of all aspects of the large publishing company as its chairman and chief executive officer. He held that position for approximately 20 years. Snyder was involved in and responsible for approximately 75 acquisitions by Simon & Schuster involving sums up to $800 million. Busch was the president and publisher of Pocket Books, the paperback division of Simon & Schuster. Certainly petitioners possessed the intellect, skills, experience, and resources to have the viability of the Plastics Recycling transactions thoroughly investigated.

Petitioners claim that they relied upon Becker for the bona fides and viability of the Partnership transactions. Yet Becker's expertise was in taxation, not plastics materials or plastics recycling, and his investigation and analysis of the Plastics Recycling transactions reflected this circumstance. Snyder knew Becker was not expert in plastics materials or plastics recycling, and there is no indication in the records that Busch believed otherwise. Moreover, Becker testified that he was very careful not to mislead any of his clients regarding the particulars of his investigation. As he put it: "I don't recall saying to a client I did due diligence * * * [Rather,] I

told [my clients] precisely what I had done to investigate or analyze the transaction.  I didn't just say I did due diligence, and leave it open for them to define what I might or might not have done."  Becker testified:  "I provided every piece of information I had available to me to Mr. Snyder and Mr. Busch."

The purported value of the Sentinel EPE recycler generated the deductions and credits in these cases, and that circumstance was clearly reflected in the offering memoranda.  Certainly Becker recognized the nature of the tax benefits and, given their education and business experience, petitioners should have recognized it as well.  Yet neither petitioners nor Becker verified the purported value of the Sentinel EPE recycler.  Becker confirmed at trial that he relied on PI for the value of the Sentinel EPE recyclers.

At the meeting held in Snyder's office, Becker answered petitioners' questions and described his investigation.  Snyder testified that he and Busch "took [Becker] through the same drill we would have if it was a Simon & Schuster acquisition."  Snyder explained that from his questioning of Becker "I had to find out if there was a market, is the market sustainable, was this machine viable, was it technologically vulnerable, was the market price satisfactory to sustaining the financial projections".  (Emphasis added.)  Plainly, if Snyder and Busch truly had pursued these questions vigorously, as talented and experienced

businessmen and acquisition specialists, they would or should have learned that the Plastics Recycling deal was a sham. If they had persisted in inquiring whether the recycling machines were "technologically vulnerable", the expert testimony in these cases leads to the conclusion that they would have learned that the machinery in question was not unique but that similar or better products were readily available in the market for a fraction of the cost built into the Plastics Recycling transactions.

Corporate executives as sophisticated and experienced as petitioners either learned or should have learned the source of Becker's valuation information when they put him "through the drill" and he reported to them "precisely what [he] had done to investigate or analyze the transaction." There was a glaring gap in the valuation information Becker claims to have furnished to petitioners. Petitioners were peculiarly well qualified to understand that they were buying into an investment credit tax shelter and claiming tax benefits based on the underlying value of machinery, but neither they nor the accountant who brought the deal to them had checked out the value of that machinery with a reliable, qualified, independent source. We recognize that Snyder, as the senior person, may have been more experienced in acquisitions and in investigation than Busch. Nevertheless, both were experienced corporate executives. We do not think they were

gulled by Becker.  On this record, we believe petitioners were imprudent in their investigation, in going forward with the transaction, and in claiming the tax benefits in issue.

We hold that petitioners did not reasonably or in good faith rely on Becker as an expert or a qualified professional working in the area of his expertise to establish the fair market value of the Sentinel EPE recycler and the economic viability of the Partnership transactions.  Becker never assumed such responsibility, and when he reported to his clients exactly what he had done he took care not to overgeneralize his investigation as "due diligence."  Petitioners and Becker claim they relied on Miller and other PI personnel with respect to the value of the recycler and the economic viability of the Partnership transactions.  See Vojticek v. Commissioner, T.C. Memo. 1995-444. Neither Becker or Miller possessed any education, special qualifications, or professional skills in plastics materials or plastics recycling.  A taxpayer may rely upon his adviser's expertise (in these cases, accounting and tax advice), but it is not reasonable or prudent to rely upon a tax adviser regarding matters outside his field of expertise or with respect to facts that he does not verify.  See Goldman v. Commissioner, 39 F.3d at 408; Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner,

T.C. Memo. 1994-329; <u>Sacks v. Commissioner</u>, T.C. Memo. 1994-217; <u>Rogers v. Commissioner</u>, T.C. Memo. 1990-619.

### 3.  The Private Offering Memoranda

In addition to purportedly relying on Becker and Miller, petitioners maintain that they reasonably relied upon the offering memoranda distributed by the Partnerships.

The offering memoranda included numerous caveats and warnings with respect to the Partnerships, including:  (1) The substantial likelihood of audit by the IRS and a likely challenge of the purported value of the recyclers; (2) the general partner's lack of experience in marketing recycling or similar equipment; (3) the lack of an established market for the recyclers; and (4) uncertainties regarding the market prices for virgin resin and the possibility that recycled pellets would not be as marketable as virgin pellets.  In addition, the offering memoranda noted a number of conflicts of interest, including Miller's interest in F & G Corp. and his representation of Burstein, PI, and Raymond Grant, who was the sole shareholder of ECI Corp.  A careful consideration of the materials in the respective offering memoranda, especially the discussions of high writeoffs and risk of audit, should have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits.  See <u>Collins v. Commissioner</u>, 857 F.2d

1383, 1386 (9th Cir. 1988), affg. <u>Dister v. Commissioner</u>, T.C. Memo. 1987-217; <u>Sacks v. Commissioner</u>, <u>supra</u>.

According to the offering memoranda, for each $50,000 investor, the projected first-year tax benefits were investment tax credits in excess of $82,500, plus deductions in excess of $40,000.[11]  In the case of SAB Recovery, which closed December 21, 1981, these tax benefits accrued in less than 2 weeks.  As a result of his $25,000[12] investment in SAB Reclamation in 1982, Busch claimed an operating loss in the amount of $20,050 and investment tax and business energy credits in the amount of $41,856.  For his $50,000 investment in SAB Recovery in 1981, Snyder claimed an operating loss in the amount of $39,698 and investment tax and business energy credits totaling $82,536.  In 1982 Snyder claimed an operating loss in the amount of $40,100 and investment tax and business energy credits totaling $83,712, both flowing from his $50,000 investment in SAB Reclamation that year.

The direct reductions claimed on petitioners' Federal income tax returns, from the investment tax credits alone, equaled 167

---

[11]    The projected tax benefits for the Partnerships in the first year of the investment, for each $50,000 investor, were as follows:  Investment tax credits of $82,639, plus deductions of $40,003 for SAB Recovery in 1981, and investment tax credits of $83,712 and deductions of $40,234 for SAB Reclamation in 1982.

[12]    The amounts invested by petitioners as set forth above are the gross amounts invested, unreduced by any rebated commissions or advance royalty payments.

percent of their cash investments, without taking into consideration any rebated commissions and advance royalty payments. Therefore, after adjustments of withholding, estimated tax, or final payment, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners [Snyder and Busch] never had any money in the [Partnership transactions]." In view of the disproportionately large tax benefits claimed on petitioners' 1981 and 1982 Federal income tax returns, relative to the dollar amounts invested, further investigation of the Partnership transactions clearly was required. A reasonably prudent person would have asked a qualified independent tax adviser if this windfall were not too good to be true. McCrary v. Commissioner, 92 T.C. 827, 850 (1989). A reasonably prudent person would not conclude without substantial investigation that the Government was providing tax benefits so disproportionate to the taxpayers' investment of their own capital.

Petitioners' arguments are not supported by the Ninth Circuit Court of Appeals' partial reversal of our decision in Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996). In Osterhout, on which petitioners rely, we found that certain oil and gas partnerships were not engaged in a trade or business and

sustained respondent's imposition of the negligence additions to tax with respect to one of the partners therein.[13] The taxpayer had relied in part upon a tax opinion contained in the offering materials. The Court of Appeals for the Ninth Circuit reversed our imposition of the negligence additions to tax. However, the prefaces to the offering memoranda[14] for the Partnerships herein warned prospective investors that the tax opinion letter was not in final form, and was prepared for the general partner, and that prospective investors should consult their own professional advisers with respect to the tax benefits and tax risks associated with the respective Partnerships. The tax opinion letter was addressed solely to the general partner and contained the following opening disclaimer:

> This opinion is provided to <u>you for your individual guidance</u>. <u>We expect that prospective investors will rely upon their own professional advisors</u> with respect to all tax issues arising in connection with an investment in the Partnership and the operations thereof. We recognize that you intend to include this letter with your offering materials and we have consented to that with the understanding that <u>the</u>

---

[13] <u>Osterhout v. Commissioner</u>, T.C. Memo. 1993-251, involved a group of consolidated cases. The parties therein agreed to be bound by the Court's opinion regarding the application of the additions to tax provided for under sec. 6653(a), inter alia. Accordingly, although the Court's analysis focused on one taxpayer, the additions to tax were sustained with respect to all of the parties.

[14] As noted, the offering memoranda for SAB Reclamation and SAB Recovery were submitted into the records in docket Nos. 1643-89 and 618-90, the Snyder cases, but not in docket No. 599-89, the Busch case.

> purpose in distributing it is to assist your offerees'
> and their tax advisors in making their own analysis and
> not to permit any prospective investor to rely upon our
> advice in this matter.  [Emphasis added.]

Accordingly, both the offering memoranda and the tax opinion
letter expressly and unambiguously indicated that prospective
investors such as petitioners were not to rely upon the tax
opinion letter.  See Collins v. Commissioner, supra.  The
limited, technical opinion of tax counsel in these cases was not
designed as advice upon which taxpayers might rely and the
opinion of counsel itself so states.

### 4.  Miscellaneous

Petitioners' reliance on Reile v. Commissioner, T.C. Memo.
1992-488, and Davis v. Commissioner, T.C. Memo. 1989-607, is
misplaced.  This Court declined to sustain the negligence
additions to tax in those cases for reasons inapposite to the
facts herein.  In the Davis case, the taxpayers reasonably relied
upon a "trusted and long-term adviser" who was independent of the
investment venture, and the offering materials reviewed by the
taxpayers did not reflect the inexperience of those who were
responsible for the venture.  In the Reile case, the taxpayers, a
married couple, had only one year of college between them and
characterized themselves as financial "dummies."  In contrast to
those cases, petitioners herein are well educated and remarkably
sophisticated and successful corporate executives.  Becker and
Miller were not long-term advisers of petitioners, nor were they

independent of the Partnerships.  In addition, the offering memoranda disclosed that the Partnerships had no prior operating history and the general partner had no prior experience in marketing recycling or similar equipment.

Petitioners' position also is not supported by Evatt v. Commissioner, T.C. Memo. 1992-368, Borrell v. Commissioner, T.C. Memo. 1989-251, or Mollen v. United States, 72 AFTR 2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993), cases in which the negligence addition to tax was denied.  In the Borrell case, the taxpayer had nurtured and developed a trust in her adviser through social activities with him and his family, and she knew that the adviser's three daughters were partners in the venture (the other two partners were the taxpayer and a hospital administrator).  No such relationship existed between petitioners and Becker, and Snyder had not spoken to Miller in roughly 25 years.  In the Evatt case, the taxpayer relied upon an attorney and an accountant to convert his business to corporate form and prepare his and the corporation's tax returns, matters well within their areas of expertise.  Here, petitioners relied on Becker and Miller for matters beyond their area of expertise. Accordingly, petitioners' reliance on the Borrell and Evatt cases is misplaced.

In Mollen, the taxpayer was a medical doctor who specialized in diabetes and who, on behalf of the Arizona Medical

Association, led a continuing medical education (CME) accreditation program for local hospitals. The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership that invested in the production, marketing, and distribution of medical educational video tapes. The District Court found that the taxpayer's personal expertise and insight in the underlying investment gave him reason to believe it would be economically profitable. Although the taxpayer was not experienced in business or tax matters, he did consult with an accountant and a tax lawyer regarding those matters. Moreover, the District Court noted that the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable." Id.; see Zfass v. Commissioner, T.C. Memo. 1996-167.

The records in these cases show that neither petitioners nor Becker had any formal education, expertise, or experience in plastics materials or plastics recycling. None of them had any personal insight or industry know-how in plastics recycling that would reasonably lead them to believe that the Plastics Recycling transactions would be economically profitable. Petitioners and Becker relied upon representations by insiders of the ventures; neither hired any independent experts in the field of plastic materials or plastics recycling. Becker discussed the transactions with Canno, who apparently was familiar with the plastics industry, but did not hire Canno to investigate PI and

the Sentinel EPE recycler.  Canno never saw a Sentinel EPE recycler and never prepared any kind of formal, written analysis of the venture.  The facts of these cases are distinctly different from those in the <u>Mollen</u> case.  Therefore, we consider petitioners' arguments with respect to the <u>Mollen</u> case inapplicable here.

### 5.  Conclusion as to Negligence

Under the circumstances of these cases, these highly sophisticated petitioners failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on their respective Federal income tax returns.  Petitioners did not reasonably rely upon the offering materials.  Becker disclosed the extent, nature, and limitations of his investigation of the transaction.  He did not possess any education, special qualifications, or professional skills in the plastics or recycling industries.  Nor did Miller, an insider to the Plastics Recycling transactions upon whom petitioners and Becker allegedly relied for the value of the recycler and the economic viability of the transactions.  See <u>Goldman v. Commissioner</u>, 39 F.3d at 408; <u>Marine v. Commissioner</u>, 92 T.C. 958 (1989); <u>McCrary v. Commissioner</u>, 92 T.C. 827 (1989); <u>Rybak v. Commissioner</u>, 91 T.C. 524 (1988).  For these reasons and others discussed above, we conclude that petitioners were negligent in claiming the deductions and credits with respect to the

Partnerships on their Federal income tax returns for 1982. We hold, upon consideration of the entire records, that petitioners are liable for the negligence related additions to tax under the provisions of section 6653(a)(1) and (2). Respondent is sustained on this issue.

B.  Section 6659--Valuation Overstatement

Respondent determined that petitioners are each liable for the section 6659 addition to tax on the portion of their respective underpayments attributable to valuation overstatement. Petitioners Busch conceded the section 6659 addition to tax in their stipulation of settled issues; Snyder did not. Snyder has the burden of proving that respondent's determinations of the section 6659 additions to tax for 1981 and 1982 are erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement. Sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. Sec. 6659(b).

Snyder claimed investment tax and business energy credits based on a purported value for the Sentinel EPE recycler in excess of $1,162,000.[15] Snyder concedes that the fair market value of a Sentinel EPE recycler during 1981 and 1982 was not in excess of $50,000. Therefore, if disallowance of the claimed credits is attributable to the valuation overstatement, Snyder is liable for the section 6659 addition to tax at the rate of 30 percent of the respective underpayments of tax attributable to the credits claimed with respect to the Partnerships.

### 1. Concession of the Deficiency

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements. See McCrary v. Commissioner, supra; Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to

---

[15]   In a Statement of Supplemental Information Pursuant to sec. 1.48-4(g)(4), Income Tax Regs., attached to SAB Recovery's 1981 partnership return, the fair market value of the seven recyclers is listed as $8,138,667. Seven divided into $8,138,667 equals $1,162,666. However, in two other statements attached to the return, the partnership reports that its basis in qualifying recycling equipment is $9,212,401. As reported on line 21 of his Form K-1, Snyder's share of the basis is $412,683 (4.479638% x 9,212,401 = 412,682). The figure on the Form K-1 results from round up and is the amount Snyder used to compute his tax credits. The source of the additional basis is not clear from the records.

valuation overstatements.  Krause v. Commissioner, 99 T.C. 132,
178 (1992) (citing Todd v. Commissioner, supra), affd. sub nom.
Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994).
However, when valuation is an integral factor in disallowing
deductions and credits, section 6659 is applicable.  See Illes v.
Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo.
1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir.
1991) (section 6659 addition to tax applies if a finding of lack
of economic substance is "due in part" to a valuation
overstatement), affg. T.C. Memo. 1989-684; Masters v.
Commissioner, T.C. Memo. 1994-197, affd. without published
opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner,
T.C. Memo. 1991-321.

In the stipulation of settled issues, Snyder concedes that
he is not entitled to any deductions, losses, investment credits,
business energy investment credits, or any other tax benefits
claimed on his tax returns as a result of his being a partner in
SAB Recovery and SAB Reclamation.  In Todd v. Commissioner,
supra, and McCrary v. Commissioner, supra, we denied application
of section 6659, even though the subject property was overvalued,
because the related deductions and credits had been conceded or
denied in their entirety on other grounds.  In Todd, we found
that an underpayment was not attributable to a valuation
overstatement because the subject property was not placed in

service during the years in issue.  In <u>McCrary</u>, we found the taxpayers were not liable for the section 6659 addition to tax when, prior to the trial of the case, the taxpayers conceded that they were not entitled to the investment tax credit because the agreement in question was a license and not a lease.  In both cases the underpayment was attributable to something other than a valuation overstatement.

Concession of the investment tax credit in and of itself does not relieve a taxpayer of liability for the section 6659 addition to tax.  See <u>Dybsand v. Commissioner</u>, T.C. Memo. 1994-56; <u>Chiechi v. Commissioner</u>, T.C. Memo. 1993-630.  Instead, the ground upon which the investment tax credit is disallowed or conceded is significant.  <u>Chiechi v. Commissioner</u>, <u>supra</u>.  Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax.  <u>Gainer v. Commissioner</u>, 893 F.2d 225, 228 (9th Cir. 1990), affg. T.C. Memo. 1988-416; <u>Irom v. Commissioner</u>, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part and remanding T.C. Memo. 1988-211; <u>Harness v. Commissioner</u>, <u>supra</u>.

Snyder made no argument and presented no evidence to the Court to prove that disallowance and concession of the investment tax credits related to anything other than a valuation overstatement.  To the contrary, Snyder stipulated substantially

the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, T.C. Memo. 1992-177. In the Provizer case, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers. The overvaluation of the recyclers, exceeding 2325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked economic substance. Similarly, the records in these cases plainly show that the overvaluation of the recyclers is integral to and is the core of our holding that the underlying transactions here are shams and lack economic substance. When a transaction lacks economic substance, section 6659 will apply because the correct basis is zero, and any basis claimed in excess of that is a valuation overstatement. Gilman v. Commissioner, supra; Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

We held in Provizer v. Commissioner, supra, that each Sentinel EPE recycler had a fair market value not in excess of $50,000. Our finding in the Provizer case that the Sentinel EPE recyclers had been overvalued was integral to and inseparable

from our finding of a lack of economic substance. Snyder conceded that the Partnership transactions were similar to the Clearwater transaction described in <u>Provizer v. Commissioner</u>, <u>supra</u>, and we have found that the Partnership transactions lacked economic substance. Given his concession, and our finding of a lack of economic substance, and the fact that the records here plainly show that the overvaluation of the recyclers was the reason for the disallowance of the tax benefits, we conclude that the deficiencies caused by the disallowance of the claimed tax benefits were attributable to the overvaluation of the Sentinel EPE recyclers.

2. Section 6659(e)

Snyder also contests the imposition of the section 6659 addition to tax on the ground that respondent erroneously failed to waive the addition to tax. Section 6659(e) authorizes respondent to waive all or part of the addition to tax for valuation overstatement if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith. Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion. <u>Krause v. Commissioner</u>, 99 T.C. at 179.

Snyder urges that he relied on the offering memoranda, Becker, and Miller in deciding on the valuation claimed on his

tax returns.  Snyder contends that such reliance was reasonable, and, therefore, respondent should have waived the section 6659 addition to tax.  Snyder cites Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23; Krause v. Commissioner, 99 T.C. 132 (1992); and Rousseau v. United States, 71A AFTR 2d 93-4294, 91-1 USTC par. 50,252 (E.D. La. 1991), in support of his argument.

We have held that Snyder's purported reliance on the offering materials, Becker, and Miller was not reasonable.  Becker had no education or experience in plastics or plastics recycling and fully disclosed the limitations of his investigation.  Miller was an insider to the Plastics Recycling transaction, and there is no indication in the records that he had any expertise in plastics materials or plastics recycling.  The evaluators whose reports were appended to each of the offering memoranda, Ulanoff and Burstein, each owned interests in partnerships which leased Sentinel EPE recyclers, and Burstein was also a client of Miller's.  The offering memoranda contained numerous caveats, including the following:  NO OFFEREE SHOULD CONSIDER THE CONTENTS OF THIS MEMORANDUM *** AS *** EXPERT ADVICE.  Snyder did not see a Sentinel EPE recycler prior to investing in the Partnerships, and he did not independently investigate the recyclers.

Snyder's reliance on Mauerman v. Commissioner, supra, Krause v. Commissioner, supra, and Rousseau v. United States, supra, in support of his contention that he acted reasonably, is misplaced. In the Krause and Rousseau cases, the section 6659 addition to tax was held inapplicable in view of the respective holdings that the taxpayers were not subject to the negligence additions to tax; the taxpayers had a reasonable basis for the valuations claimed on the tax returns or had reasonable cause for the understatements on the returns. In contrast, we have held that Snyder did not act reasonably in claiming deductions and investment tax credits related to the Partnerships, that the errors on his tax returns were caused by the excessive valuations of the underlying machinery in the Partnership transactions, that he lacked reasonable cause for such overvaluation, and that he is therefore liable for the negligence additions to tax under section 6653(a). Accordingly, Snyder's reliance on the Krause and Rousseau cases is misplaced.

In Mauerman, the Tenth Circuit Court of Appeals held that the Commissioner had abused her discretion by not waiving a section 6661 addition to tax. Like section 6659, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith. Sec. 6661(c). The taxpayer in Mauerman relied upon independent attorneys and accountants for

advice as to whether payments were properly deductible or capitalized. The advice relied upon by the taxpayer in Mauerman was within the scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In Snyder's cases, particularly with respect to valuation, he relied upon advice which was outside the scope of expertise and experience of his supposed advisers. Consequently, we consider Snyder's reliance on the Mauerman case inapplicable.

Snyder also submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates, in support of his position that the valuation he claimed on his returns was reasonable. Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners." Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000. However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the fall of 1981 and 1982.

We accord no weight to the Carmagnola reports submitted by petitioners. The projected valuations therein were based on

inadequate information,[16] research, and investigation, and were subsequently rejected and discredited by their author. Respondent likewise rejected the reports and considered them unsatisfactory for any purpose, and there is no indication in the records that respondent used them as a basis for any determinations in the notices of deficiency. Even so, Snyder's counsel obtained copies of these reports and urges that they support the reasonableness of the values reported on Snyder's returns. Not surprisingly, Snyder's counsel did not call Carmagnola to testify in these cases,[17] but preferred instead to rely solely upon his preliminary ill-founded valuation estimates. The Carmagnola reports were a part of the record considered by this Court and reviewed by the Sixth Circuit Court of Appeals in the Provizer case, where we held the taxpayers liable for the section 6659 addition to tax. Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence.

---

[16] In one preliminary report, Carmagnola states that he has "a serious concern of actual profit" from a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

[17] Carmagnola has not been called to testify in any of the Plastics Recycling cases before us.

Snyder will not be relieved of the section 6659 additions to tax based on the preliminary reports prepared by Carmagnola.

We hold that Snyder did not have a reasonable basis for the adjusted bases or valuations reflected on his returns with respect to his investments in the Partnerships.  Respondent properly could find herein that Snyder's reliance on the offering materials, Becker, and Miller was unreasonable.  The records in Snyder's cases do not establish an abuse of discretion on the part of respondent but support respondent's position.  We hold that respondent's refusal to waive the section 6659 addition to tax is not an abuse of discretion.  Respondent is sustained on this issue.

<u>Decisions will be entered</u>

<u>under Rule 155</u>.